615 So.2d 466 (1993)
William Ernest SHAW, et al.
v.
Emmett J. BOURN, Jr.
No. 92-CA-0552.
Court of Appeal of Louisiana, Fourth Circuit.
February 26, 1993.
Writ Denied April 30, 1993.
Kathleen E. Simon, Simon and Rees, New Orleans, for defendant-appellant Emmett J. Bourn, Jr.
Jerry L. Saporito, Patricia S. LeBlanc, Karen Wells Roby, Bernard, Cassisa, Saporito & Elliott, Metairie, for defendant appellant Prudential Property and Cas. Ins. Co.
Christopher J. Bruno, Bruno & Bruno, for plaintiffs-appellees.
Before KLEES, CIACCIO and WALTZER, JJ.
WALTZER, Judge.
This is an appeal from a July 29, 1991 judgment in accordance with a unanimous jury verdict, granting damages to a father, *467 mother, and minor child for physical and psychological injuries suffered as a result of the molestation of the minor child by defendant Emmett J. Bourn, Jr.
The jury and court awarded $250,000.00 general damages and $29,000.00 future medical expenses to the child, $15,000.00 to the mother for loss of consortium, and $2,500.00 to the father for loss of consortium in a judgment dated June 13, 1991.
After trial the plaintiff moved for additur on the grounds that the jury failed to award past medicals because there was no place on the jury interrogatories for them to write in an award for past medicals. Plaintiff and defendant had stipulated to $13,823.25 in medical bills and $2,000.00 in medical travel expenses. Plaintiff also filed a rule to fix costs for its experts presented at trial. Defendant Prudential moved for judgment n.o.v. on the issues of liability, policy coverage and reduced damages and alternatively for a new trial. Defendant Bourn moved for a judgment n.o.v. on the issue of quantum and alternatively for a new trial. All motions were heard at a hearing on July 23, 1991. With respect to the rule to fix costs, the court awarded Dr. Sanders $2200.00 and Dr. Salzer $400.00.
On July 29, the trial court judge signed a judgment awarding to plaintiff 80% of the past medical and travel expenses which equaled $15,823.25, restating the jury verdict and denying defendants motions for new trial. The court further denied Prudential Property & Casualty Insurance Company's (hereinafter "Prudential") motion for judgment notwithstanding the verdict on the issue of homeowner's policy coverage. From the July 29, 1991 judgment, Prudential perfected a suspensive appeal and Emmett Bourn perfected a devolutive appeal.
The father, mother, and their two girls and one boy and Emmett Bourn, his wife, and their grandson and granddaughter were good friends, neighbors and co-workers for 10 years. Mr. Bourn was the father's boss. The Bourn children and the plaintiffs children were best friends. Throughout the 10 years of family friendship, Emmett Bourn consistently sexually abused plaintiff's daughter two to three times a week from the time she was almost 9 years old until she was 14. The first molestation took place at a Gulf Oil Company Plant Annual Family Picnic.
Plaintiff's daughter was not the only child abused by Bourn. Bourn abused all of his granddaughter's girl friends including three others who also filed criminal charges. In fact the plaintiffs first became aware of the molestation on December 11, 1987 when a school official contacted them. Several of the girls had complained to Bourn's granddaughter about being molested by Bourn. The granddaughter watched via mirrors while Bourn molested the plaintiff minor child in the instant case. The granddaughter became disgusted by it and told the school counselor about the molestation. The school in turn contacted the girls' parents.
Upon being informed, the plaintiff parents immediately contacted the police and filed charges against Emmett Bourn. The police told plaintiffs to take their daughter to Children's Hospital for verification. The plaintiffs immediately took the child to Children's Hospital. The doctor at Children's Hospital found that the child had a linear scar at the 7 o'clock position of the fossa navicularis which is consistent with her having been penetrated and that she had been molested.
Bourn was charged with aggravated rape and pled guilty to indecent behavior with a juvenile. He stated that he pled guilty because he did "pat [the child] on her privates" and he "owed for that." He paid a fine and received a two year suspended sentence pending probation and therapy. He has stopped going to therapy. He has never denied molesting the child.
On appeal, the two main issues are whether the trial court erred in finding that the homeowner's policy issued by Prudential covered molestation and whether the damages awarded were excessive.

I. COVERAGE
Turning to the issue of coverage first, on appeal Prudential argues that the *468 trial court erred in denying its motions for summary judgment, directed verdict, judgment n.o.v., and motion for new trial on the issue of coverage and that the trial court erred in submitting the coverage issue to the jury.
The Prudential policy provided as follows[1]:
"1. Coverage EPersonal Liability and Coverage FMedical Payments to Others do not apply to bodily injury or property damage:
a. which results from an act:
(1) that is intended by any insured to cause harm; or
(2) that an insured could reasonably expect would cause harm.
This exclusion applies whether or not the insured:
(1) intended or expected the results of his or her act, so long as the resulting injury or damage was a natural consequence of the intended act; or
(2) was intoxicated; was insane; or is deemed not to have had the mental capacity to form the legal intent to commit the act causing injury or damage."
At trial Dr. Oliver Sanders repeatedly testified that Emmett Bourn did not intend to harm the child because he does not believe that sexual molestation causes harm to children.
When the jury retired to deliberate, they initially returned with the following answers to the following jury interrogatories:
"3. Were the injuries sustained by [the child] a result of the negligence of Emmett J. Bourn, Jr.? YES__ NO__
4. Were the injuries sustained by [the child] a result of the intentional act of Emmett J. Bourn, Jr.? YES__ NO__
* * * * * *
12. Did the Prudential insurance policy issued to Mr. Bourn provide coverage for the damages, if any, sustained by [the child] and/or her parents? YESX NO__"
The trial judge then instructed the jury that they must find either negligence or an intentional act on the part of Emmett Bourn. The jury returned to deliberate and returned with a finding of negligence on Emmett Bourn's part.
Bourn and the plaintiffs argue that under the jury's finding that child molestation was a negligent and not an intentional act, the intentional act exclusion of the homeowner's policy would not apply, such that the homeowner's policy would cover the loss under the rationale of Breland v. Schilling, 550 So.2d 609 (La.1989) rehearing denied (La.1989).
Under the definition of intent discussed in Bazley v. Tortorich, 397 So.2d 475 (La. 1981), there is no question but that Mr. Bourn's acts of molestation are intentional acts excluded by the policy:
"The meaning of `intent' is that the person who acts either (1) consciously desires the physical result of his act, whatever the likelihood of that result happening from his conduct; or (2) knows that that result is substantially certain to follow from his conduct, whatever his desire may be as to that result. Thus, intent has reference to the consequences of an act rather than to the act itself. Restatement (Second) of Torts, supra, § 8; LaFave and Scott, Criminal Law, § 28 (1972); see also, Prosser, supra, § 8." (Emphasis supplied) (At 481).
The court in Bazley, above, further stated that although some appellate courts had attempted to make the disjunctive "or" in the definition of intent into the conjunctive and thus create a two-pronged test from two different alternatives, the Supreme Court specifically repudiated the two-prong test in favor of the disjunctive two alternatives interpretation:
"For these reasons, we construe the legislation under review as providing that the exclusive remedy rule shall be inapplicable to intentional torts or offenses. The meaning of intent in this *469 context is that the defendant either desired to bring about the physical results of his act or believed they were substantially certain to follow from what he did. Several courts of appeal have stated the two prongs of the definition in the conjunctive, thus requiring a plaintiff to prove, in order to recover, that the defendant desired the physical results of his act in every case. Waldrop v. Vistron Corp., 391 So.2d 1274 (La.App.1980); McGuire v. Honeycutt, 387 So.2d 674 (La.App. 3d Cir.1980); Johnson v. Chicago Mill & Lumber Co., 385 So.2d 878 (La.App. 2d Cir.1980); Courtney v. BASF Wyandotte Corp., 385 So.2d 391 (La.App. 1st Cir.) writ denied 386 So.2d 359 (La.1980); Bourgoyne v. City of Baton Rouge, 380 So.2d 131 (La.App. 1st Cir.1979) cert. denied 382 So.2d 164 (1980); Frazier v. Woodward, 378 So.2d 209 (La.App. 4th Cir.1979); Johnson v. Narcisse, 373 So.2d 207 (La.App. 4th Cir.1979) Tobin v. Jacobson, 369 So.2d 1161 (La.App. 1st Cir.1979); Guidry v. Aetna Casualty & Surety Company, 359 So.2d 637 (La.App. 1st Cir.) writ denied, 362 So.2d 578 (La.1978). Intent is not, however, limited to consequences which are desired. If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result. Restatement (Second) of Torts, § 8A, Comment; Prosser, supra, § 8." (Emphasis supplied) (At 482).
Thus under the first Bazley definition of intentional act, child molestation would be an intentional act, as the perpetrator desired the physical result (molestation) of his act (fondling the victim).
In Breland v. Schilling, 550 So.2d 609 (La.1989) rehearing denied (La.1989), an altercation occurred during an Old Timers League softball game when words were exchanged when Ronald "Bug" Schilling was tagged out on a run between second and third by William Breland. Schilling punched Breland in the mouth. Because Breland's jaw was open at the time, he suffered unusually severe fractures, breaking his jaw on both sides of his face. His jaw was wired shut for 12 weeks during which he was unable to eat solid food and lost 30 pounds and suffered from depression. He retained scars on both sides of his face.
The insurance policy in Breland provided that it did not apply:
"f. to bodily injury or property damage which is either expected or intended from the standpoint of the Insured".
In construing the policy language in Breland, above, the Supreme Court found the language ambiguous citing Pique v. Saia, 450 So.2d 654, 655 (La.1984) and applied the two rules of policy interpretation that:
(1) "Policies should be construed to effect, not deny, coverage. Borden, Inc. v. Howard Trucking Co., Inc., 454 So.2d 1081, 1090 (La.1984); LeJeune v. Allstate Ins. Co., 365 So.2d 471, 479 (1978)" and
(2) "An exclusion from coverage should be narrowly construed. Snell v. Stein, 261 La. 358, 259 So.2d 876 (1972)." (At 610).
Applying those two rules of construction the court stated:
"We hold, therefore, that when minor bodily injury is intended, and such results, the injury is barred from coverage. When serious bodily injury is intended, and such results, the injury is also barred from coverage. When a severe injury of a given sort is intended, and a severe injury of any sort occurs, then coverage is also barred. But when minor injury is intended, and a substantially greater or more severe injury results, whether by chance, coincidence, accident, or whatever, coverage for the more severe injury is not barred. Whether a given resulting bodily injury was intended `from the standpoint of the insured' within these parameters is a question of fact. Such factual determinations are the particular province of the trier of fact, in this instance the trial jury.
The terms of this insurance contract dictate that the insured's subjective intent regarding bodily injury, as measured by the fact finder, controls whether *470 coverage applies. A review of the record indicates that this defendant's subjective intent was given reasonable construction by the jury." (At 614).
In Doe v. Smith, 573 So.2d 238 (La.App. 1st 1990), writ denied 573 So.2d 1139 (La.1991) the court stated:
"Generally, the purpose of an intentional injury exclusion is to restrict liability insurance coverage by denying coverage to an insured in circumstances where the insured acts deliberately and intends or expects bodily injury to another. The exclusion is `designed to prevent an insured from acting wrongfully with the security of knowing that his insurance company will "pay the piper" for damages.' Breland v. Schilling, 550 So.2d 609, 610 (La.1989)." At 241.
The facts in Doe, supra are similar in that defendant Smith molested his neighbors' minor daughter for a ten-year period and concealed his activities by threatening the child. Smith was covered by an Allstate policy which provided:
"We do not cover any bodily injury or property damage which may reasonably be expected to result from the intentional or criminal acts of an insured person or which are in fact intended by an insured person." (At 241).
The court in Doe found that:

"... child molestation is one such rare instance where a factual determination of negligence or intentional conduct is inappropriate as a practical matter. These types of acts cannot result from careless conduct and only occur as a result of a deliberate act by the perpetrator. Additionally, the alleged acts giving rise to the instant suit occurred repeatedly over an almost ten year period. Clearly, Smith's acts of child molestation were deliberate and, therefore, intentional acts.
Having determined that Smith's acts were intentional, we must determine what consequences an objective reasonable person might expect or intend as a result of a deliberate act of child molestation.
In their petition, plaintiffs alleged that, as a result of the physical, mental, and emotional abuse of the molestation, the minor child has been permanently scarred psychologically as well as physically. Plaintiffs pray for damages for the child's psychological care, emotional pain and suffering, and impairment of the relationship among the parents and the child. These allegations clearly allege the kind of consequences an objective reasonable person might expect as a result of Smith's deliberate acts of molestation.
Accordingly, we find that the language of the Allstate policy excludes the reasonable consequences of Smith's deliberate acts of molestation ..." (Emphasis supplied.) (At 243-244).
In Wallace v. Cappel, 592 So.2d 418 (La.App. 1st 1991) writ denied 593 So.2d 651 (1992), the First Circuit stated:
"Child molestation is a rare instance in which a factual determination of negligence or intentional conduct is inappropriate as a practical matter. It cannot result from careless conduct and only occurs as a result of a deliberate act by the perpetrator. Molestation of a child is a deliberate act, and therefore, is an intentional act. See Doe v. Smith, 573 So.2d 238 (La.App. 1st Cir.1990), writ denied, 573 So.2d 1139 (La.1991); Menard v. Zeno, 558 So.2d 744 (La.App. 3d Cir.), writ denied 561 So.2d 121 (La.1990)."
Menard v. Zeno, 558 So.2d 744 (La.App. 3d 1990) writ denied 561 So.2d 121 (La.1990) interpreted an Aetna policy which provided exclusions for personal liability and medical payments for
"... bodily injury or property damage which is either expected or intended from the standpoint of an insured."
As stated by the court in Menard, "Jonathan Zeno, then sixteen years old, forcefully and maliciously held a knife to the throat of Kevin Menard, then eight years old, and forced the latter, against his will, to submit to sexual anal intercourse" (At 745). The Menards sued the Zenos, parents and child, and their homeowners insurer, Aetna. The *471 appellate court in Menard cited Breland, above, stated that:
"... the court adopted the fact sensitive test for inquiring into the subjective intention or expectation of the insured and rejected the approach that an insured intends, as a matter of law, all injuries which flow from an intentional act."
The court quoted Breland, above, stating:
"Whether a given resulting bodily injury was intended `from the standpoint of the insured' within parameters is a question of fact. Such factual determinations are the particular province of the trier of fact, in this instance the trial jury."
The language at issue in the instant case is that personal liability coverage and medical payments coverage do not apply to bodily injury or property damage which results from an act:
"(2) that an insured could reasonably expect would cause harm."
The use of the words "reasonably" and "an" instead of the word "the" indicates that the policy does not look to the subjective fact-based test of the particular insured, but rather uses a reasonable man standard. As such, even if Mr. Bourn is incapable of foreseeing the harm to the plaintiffs which we find was substantially certain to follow his acts of molestation, he should have because any, indeed, every reasonable man expects children to be harmed by molestation. Thus Mr. Bourn's state of mind is irrelevant in light of the policy language. We find that Bourn's homeowner's policy does not allow for coverage for his acts of molestation.
We further adopt the holding of Doe v. Smith, above, that:

"...child molestation is one such rare instance where a factual determination of negligence or intentional conduct is inappropriate as a practical matter. These types of acts cannot result from careless conduct and only occur as a result of a deliberate act by the perpetrator."

and of Wallace v. Cappel, above, that:
"Child molestation is a rare instance in which a factual determination of negligence or intentional conduct is inappropriate as a practical matter. It cannot result from careless conduct and only occurs as a result of a deliberate act by the perpetrator. Molestation of a child is a deliberate act, and therefore, is an intentional act."
Having concluded that as a matter of law child molestation is an intentional act, we find that the trial court committed reversible error in submitting the question on policy coverage to the jury.
We hasten to add, however, that our ruling does not mean that the plaintiffs will not be able to recover against Bourn personally. This is a case about personal responsibility. Mr. Bourn is personally responsible for his acts of molestation and he is personally liable for them. The general theory of insurance is that certain losses are diffused among all members of society and this makes sense especially in case of losses due to floods, hurricanes, earthquakes, and other natural disasters. But the cost of damage caused by sexual molestation is not a burden that society as a whole should bear. It is an intentional act and it is a burden to be laid squarely upon the shoulders of the molester. In this case it will by borne by Bourn.

II. DAMAGES
On appeal Prudential and Bourn argue that the damages awarded by the jury were excessive.
This case is unusual in that psychiatrist Oliver Sanders, M.D. examined both the victim and the defendant Emmett Bourn. Dr. Sanders diagnosed Emmett Bourn as a pedophiliac. He further diagnosed the plaintiff minor child as molested. While Dr. Sanders was hired by the plaintiff in this matter, we note that Code of Evidence Article 706 A. provides that "[i]n a civil case, the court may on its own motion ... enter an order to show cause why expert witnesses should not be appointed... The court may ... appoint witnesses of its own selection ..." This writer would recommend in future civil damage child molestation cases that the trial court appoint its own independent psychiatrist to *472 examine both victim and alleged perpetrator as allowed under C.E. 706.
Dr. Oliver Sanders testified that the characteristics of a molested child are that the child feels tricked or deceived and feels stupid for being tricked. The child feels ashamed and does not know what to do. It is characteristic of a molested child that the child looses self-worth and gravitates towards a rebellious, socially deviant peer group composed of other children with low self-esteem.
When the molestation comes to light, the child feels intensely relieved on the first day, but by the third day develops anxiety symptoms, relives bad memories, develops Post Traumatic Stress Disorder and Anxiety Disorder, and feels that he or she has done something unforgivably wrong. Serious depression sets in. The molested child has trouble making friends. When the molested child matures and becomes involved with the opposite sex, the molestation causes disturbances in sexual function. It impairs opposite sex relationships. A molested child feels ugly or worthless. Impairment of relationships with the opposite sex continues until midlife.
Dr. Sanders further testified that in addition to impairment of relationships with the opposite sex, the molested child will suffer impairment of relationships with his or her own children. A molested female will have anxiety about explaining sexuality to her children, even her female children. She will have additional trouble raising boys. She won't know how to handle certain stages in childhood development when the children are involved in normal sexual behavior. She feels that sex is dirty. She will have trouble telling her girls about menstruation. At midlife, she will feel angry and resentful that she was molested. She will feel cheated, that something has been taken away from her and she will feel that it is unfair, but if she has been able to establish a happy marriage and home life, she will basically resolve it at midlife.
Dr. Sanders testified that the child in the instant case has a majority of the molested child symptoms.
Dr. Sanders testified that as a result of the molestation, the child in the instant case has suffered two suicide attempts, jumping from a moving wagon and cutting her neck with a knife, and a 24 day hospitalization for major depression and to prevent another suicide attempt.
The child in the instant case testified that she first started having suicidal thoughts when Bourn was molesting her. Dr. Sanders stated that the child in the instant case undergoes therapy and will continue to need therapy either until mid-life or for the rest of her life, depending on how things resolve at the mid-life point.
The child in the instant case has nightmares that Bourn is killing her or her family. When she is awake, the child wants to move because Bourn knows where they live and she is afraid that he will attack them.
The child in the instant case suffers from unusual sleeping habits in that she suffers from insomnia, but when she is finally able to sleep she does so for incredibly long periods at a time.
The plaintiff child testified that when Bourn put his penis in her, he hurt her. Now when she thinks about the molestation, in addition to the emotional pain, she feels physical pain in her stomach. The record does not reveal whether the child has been internally examined specifically to determine whether her child-sized internal organs were physically damaged by the rape and molestation.
In addition, she handles anxiety through unusual eating habits.
The plaintiff child has been diagnosed with Post Traumatic Stress Disorder or PTSD. PTSD occurs when an a person experiences a trauma beyond the realm of normal human behavior. Dr. David Clark testified that being sexually molested is a traumatic event which would cause PTSD in anyone. Dr. Sanders also diagnosed the child with PTSD. He testified that it is characteristic of PTSD that the patient's mind is so overloaded with worry and concern that she gets too emotional to talk about it. It is called "emotional overload". The child has still not told everything that *473 Bourn did to her and her friends because she is still unable to talk about some of it.
Dr. Elaine Salzer, who also treats the child testified that the child is unable to concentrate. She drifts into a fantasy world, trying to escape all of the problems and the particular geographic location where she lives. Because of the molestation, the child flunked 5th grade at age 9 when the molestation started. In addition, she flunked 8th grade because her eighth grade teacher looked and acted like defendant Emmett Bourn. The child experienced flashbacks of the molestation in this teacher's class. The child was very angry and sharp with this teacher.
Dr. Saltzer further testified that the child just wants to leave her geographic location and all the chaos. She wants to live somewhere else where no one knows what happened and where she does not have to deal with it.
Dr. Salzer thinks that the child's two prior suicidal gestures related to her alienation and separation or threat of separation from her peers. After the molestation she was made the target of humiliation and ridicule by her peers. Her self-esteem was seriously damaged as a result of the humiliation. Some of children would bribe her or threaten her with further exposure of the molestation to other children if she did not go along with what they wanted. The plaintiff child would cooperate just not to have her molestation exposed further.
Dr. Saltzer testified that the child suffers from unrealistic guilt. She blames herself for allowing the molestation to occur because she was threatened with the loss of her best friend, Bourn's granddaughter, and she was bribed with nice things. She does not understand that there is nothing she could have done to prevent it. Bourn at 175 weighed two and half times the plaintiff minor child's weight, was taller, older, and as an adult male possessed more upper body strength than did the plaintiff child. She does not realize that none of the other little girls were able to stop him either.
Because she sees herself as responsible, it is hard for her to understand that a 9 year old cannot take responsibility for the actions of an adult. She does not understand that a 9 year old does not have the emotional and judgmental maturity for a battle of wits with an adult, otherwise our society would let 9 year olds vote, drive cars, etc. The child is having trouble differentiating for what she is and for what she is not responsible. She feels responsible not only for the actions of Bourn, a 57 year old adult, she also feels that she would be responsible for the actions of her father, if her father does physical violence to Emmett Bourn. She suffers from unrealistic self-blame and self-hate.
Dr. Saltzer further testified that the projective testing indicates that in her mind, the minor child believes that by being the victim of molestation she has been engaged in a criminal activity and that her punishment is social isolation and feeling that she has lost the love of her parents. She feels that even if she did make a friend, she would lose the friend for one reason or another beyond her control; she believes that people are better off without her.
The standard of review for damage awards requires a showing that the trier of fact abused the great discretion accorded in awarding damages. In effect, the award must be so high or so low in proportion to the injury that it "shocks the conscience". See: Canter v. Koehring Co., 283 So.2d 716 (La.1973); Moore v. Healthcare Elmwood, Inc., 582 So.2d 871 (La.App. 5th 1991); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978); Rosell v. ESCO, 549 So.2d 840 (La.1989).
The jury awarded the child $250,000.00 general damages and $29,000.00 future medical expenses. In American Motorist Insurance Company v. American Rental, Inc., et al, 579 So.2d 429 (La.1991), the Louisiana Supreme Court awarded $300,000.00 for Past and Future Mental Anguish and Distress and Physical Pain and Suffering. In Miley v. Landry, 582 So.2d 833 (La.1991) rehearing denied (La.1991), the Supreme Court awarded $300,000.00 for Past and Future Mental Anguish and Distress and Physical Pain and Suffering where plaintiff had suffered previous hospitalizations *474 for psychiatric problems, but had recovered and would not have suffered a relapse but for the auto accident at issue. In light of the evidence and testimony presented and the effect of this injury on this particular plaintiff, we cannot conclude that the jury abused its considerable discretion in the amount awarded for general damages. Canter v. Koehring Co., 283 So.2d 716 (La.1973); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978); Rosell v. ESCO, 549 So.2d 840 (La.1989).
Dr. Sanders testified that in his opinion the child will require one to two hospitalizations in the future and that each hospitalization will cost $14-15,000 for the doctors' fees and hospital services. The jury awarded the minor child $29,000.00 in future medicals. We do not find that this amount is an abuse of discretion.
We further find that the trial court did not err in granting additur for past medical costs. The parties had stipulated to this amount and the jury form did not provide a place for a past medical award.
The minor child's father and mother have also suffered as a result of the molestation. The child's father feels angry and betrayed by his former boss and friend of 10 years and he wants revenge or "at least something done". The father is so angry that he sought therapy because he was afraid that he would lose control and kill Emmett Bourn. The father says that he is able to control himself better since Bourn moved from Buras to Diamondhead and if he had to see him everyday he is afraid that he would lose control and do physical violence to him. The child's father has developed high blood pressure as a result of the molestation.
The jury awarded $2,500.00 to the child's father for loss of consortium. The evidence indicated that he is the "strong, silent" type who leaves child rearing to his wife and who has limited interaction with his children. We cannot conclude that the jury clearly abused its discretion in the amount awarded. The jury did not award anything to the father for his therapy or for the physical injury that he has suffered as a result of his daughter's molestation, namely the onset of high blood pressure.
The child's mother is angry, bitter, and resentful toward Emmett Bourn. She suffers from extreme guilt for what she perceives as her failure to protect her child from the molestation. As a result she has overreacted by becoming very overprotective and restrictive in her determination that the child will not be hurt again and thus, she will not fail her child again. The overprotection and new restrictions have caused problems between the child and her mother beyond the normal mother-daughter adolescent conflict. The mother is insecure about her relationship with her daughter and does not know what to tell the child about boys, dating, sex, etc. As a result of the molestation, the mother is filled with more anxiety than is normal and is manifesting her anxiety by extreme compulsive overeating.
The jury awarded $15,000.00 to the mother for loss of consortium. In light of the effect that the molestation has had on the mother-daughter relationship, we cannot conclude that this amount is an abuse of the jury's discretion.
For the reasons discussed, the judgment of the district court is reversed on the issue of homeowner's insurance coverage and in all other aspects is affirmed.
REVERSED IN PART AND AFFIRMED IN PART.
KLEES, J., concurs in the result only.

APPENDIX I
Dr. Oliver Sanders graduated from Emory Medical School, interned at Emory Hospital in Atlanta and did a 3 year residency in psychiatry at Tulane Medical School in the Department of Psychology and Neurology. He completed the general psychiatry residency, did a 2 year residency in child psychiatry, and is board certified in psychiatry. He has been in the private practice of psychiatry for over 20 years, served as Chief of Psychiatry 3 terms at East Jefferson Hospital and served as assistant coroner for Jefferson Parish for 20 years. He *475 is on the staff of East Jefferson Hospital and St. Jude Hospital in Kenner.
Dr. Sanders testified relative to the general characteristics of child molesters. He testified that molesters will rationalize that it is acceptable to molest a child.
He stated that the pedophile manipulates the child into believing the child has done something wrong. The child is afraid to tell because the pedophile threatens the child with loss of some kind. The literature is just beginning to examine "child sexual abuse accommodation syndrome" to explain why children do not immediately disclose the abuse spontaneously, but rather will disclose only upon direct questioning, as well as other psychological dynamics and symptoms of the molested child. State v. Frank Turner, 605 So.2d 725 (La.App. 4th, 1992).
Dr. Sanders testified that the molestation proceeds slowly. Contrary to popular depictions, the molester doesn't just grab a child one day. He outwits and seduces children by concocting elaborate methods of winning their trust. He uses candy, gifts, friendships with other children to make the child think that everything is okay. Usually, he treats the child very well in every way except for the molestation.
Dr. Sanders testified that in Mr. Bourn's case, Bourn used the swimming pool, Mopeds, and his granddaughter as bait to lure children to his house.
Dr. Sanders testified that a pedophiliac is someone who acts on recurrent, intense, sexual urges and sexually arousing fantasies of at least six months duration involving sexual activity with a prepubescent child. Dr. Sanders stated that a pedophiliac is defined in the Diagnostic & Statistical Manual, 3rd Revision as someone 16 years old or older and where there is at least a 5 year age difference between the pedophile and the victim.
Dr. Sanders testified that in most cases, the pedophilia occurs in younger people than Emmett Bourn. In most cases it occurs in adolescent young adults and midlife adults.
Dr. Sanders noted that pedophiliacs are usually attracted to children of a certain age or certain age range. Attraction to girls is twice as common as attraction to boys, but some people are aroused by both male and female children.
He further stated that pedophilia is a chronic condition and the pedophiliac has an unusual sexual drive to dominate and control. Pedophiliacs almost always are male; it is extremely rare to have a female pedophiliac.
Dr. Sanders testified that most pedophiliacs were victims of child abuse themselves during childhood and his profession is uncovering many, many more victims of child abuse and pedophiliacs than they had formerly believed to exist.
Dr. Sanders noted that some pedophiliacs limit their activities to undressing the child and fondling. They may try to put a finger in the vagina or touch or fondle the male genitals. Some try to have oral sex and try to insert objects into the girl's vagina or the boy's anus. It is unusual for the pedophile to have intercourse. Many pedophiliacs rationalize that if they do not insert their penis into the child's vagina or anus, then they are not really sexually molesting the child.
Dr. Sanders stated that a pedophiliac believes what he is doing is okay. He does not believe that there is that much wrong with it until he gets caught. He rationalizes, he explains that the child was "coming on" to him, that she was doing things to him, that she "wanted it" so he just did something to her in response. He will rationalize it by saying that the molestation is of "educational" value and that he is "teaching" the child something important or "teaching" the child sex education. He will also rationalize it by saying that the child is getting sexual pleasure out of it. He will further rationalize by saying that the child is the cause of the molestation because the child acted provocatively, the child "made" him get excited and the child was the sexual aggressor.
*476 Dr. Sanders noted that a pedophile may limit his activities to his own children, to step-children or relatives, or he may victimize only children outside of the family. Alternatively, the pedophile may not limit his activities to particular groups of children, but rather will molest any and all children to which he has access. So predatory are pedophiles that they have been known to marry divorced women with children solely for the purpose of having access to molesting the children.
Dr. Sanders testified that the pedophiliac tries to keep from getting caught. Pedophiles threaten the child to keep the child from telling and they develop complicated techniques for making the child feel bound to them. The pedophiliac knows that what he is doing is illegal and at some level knows that it is wrong, but he does not recognize the full ramifications of the damage he is doing. When a pedophiliac is caught he tries to protect himself. He realizes that he has broken the law and that it's been brought to his attention, so he tries to protect himself as well as he can. He hires an attorney, he plea bargains, he agrees to get help, but he still believes the child did it. He says that the legal system is doing these things to him and he could not help it, he had to do it to get relief. When a pedophile is caught he will blatantly deny the molestation until he is confronted with the evidence, then he will minimize what happened. He will not admit to everything that happened and will not admit to incidents other than the one for which he has been confronted with evidence. He does not truly recognize the consequences of his acts until later on. Pedophiliacs finally realize late in life that they were doing something wrong.
Dr. Sanders examined Emmett Bourn and diagnosed him as a pedophiliac.
According to Sanders, Bourn did admit that he had penile erections when molesting the minor child, but denied ever putting his penis in her vagina. Dr. Sanders stated "Mr. Bourn believes that [the child] caused this to this day and he did not cause any harm. He thinks it's a bunch of bull. I believe that's the way he feels, I may be wrong, but that is the way his mind works."
Dr. Sanders examined Bourn for organic brain damage or deterioration of the brain tissue such as the onset of alzheimer or senile dementia because it is highly unusual for there to be a first time onset of pedophilia in someone aged in their 50s. He stated that Bourn volunteered that he had trouble with a neighbor in another area and he did not reveal any more about it, so Dr. Sanders concluded that possibly Bourn has molested before and either the parents never found out or the parents did nothing about it.
Dr. Sanders stated that Bourn minimized what happened between he and the minor child and that Bourn has a projection problem. According to Dr. Sanders, projection is when you say somebody else is responsible for a problem when you are the one that is actually responsible.
NOTES
[1] The words in bold in the policy quote above are as they appear in the policy itself. The writer has not used bold typeface for emphasis.