906 So.2d 565 (2005)
Jane DOE
v.
Adam BREEDLOVE, Chad Griffin, Marvin Gahagan, Individually and on Behalf of His Son, Kramer v. Gahagan, R-D Yesterdays, Inc., Robert L. Walker and Debra Walker, and Their Insurers
No. 2004 CA 0006.
Court of Appeal of Louisiana, First Circuit.
February 11, 2005.
*567 Robert D. Hoover, Baton Rouge, Counsel for Plaintiff/Appellant Jane Doe.
Lance E. Harwell, Metairie, Counsel for Defendant/Appellee The Standard Fire Insurance Company.
Holly J. Quick, Baton Rouge, Counsel for Defendant/Appellee Louisiana Farm Bureau Casualty Insurance Company.
Henry Cole Gahagan, Jr., Natchitoches, Counsel for Defendant/Appellee Victor Kramer Gahagan.
Edwin Dunahoe, Natchitoches, Counsel for Defendant/Appellee Adam Breedlove and Chad Griffin.
Jill L. Craft, Baton Rouge, Counsel for Plaintiff/Appellant Jane Doe.
C.R. Whitehead, III, Natchitoches, Counsel for Defendant/Appellee Robert Walker, Debra Walker and R-D Yesterdays, Inc.
*568 Before: GUIDRY, GAIDRY, and McCLENDON, JJ.
GAIDRY, J.
The plaintiff-appellant, Jane Doe[1], appeals an adverse summary judgment in favor of the defendant, The Standard Fire Insurance Company (Standard Fire), finding no coverage under its policy of liability insurance for her various claims asserted against its insured in this litigation. For the following reasons, we affirm.

FACTS AND PROCEDURAL HISTORY
On April 17, 2000, the plaintiff, Jane Doe, was a 22-year-old college student attending Northwestern State University in Natchitoches and also worked at a furniture store. That evening, she accompanied a male friend to a local bar. After consuming one mixed drink, she left that bar with a second mixed drink and went to another bar, Yesterday's. While there, she encountered Adam Breedlove, an acquaintance who worked at the same furniture store. In the course of a brief conversation on the dance floor, Mr. Breedlove allegedly asked the plaintiff what she was drinking, and she handed her drink to him to sample it. The plaintiff contends that Mr. Breedlove somehow surreptitiously placed Rohypnol[2] or a similar drug in her drink, although she admittedly has no direct evidence supporting that contention.
Upon leaving the bar around its closing time, another pair of friends drove the plaintiff to her residence. After changing into her bedclothes, the plaintiff telephoned the first friend with whom she had left her residence and invited him to watch a movie. Soon after, she became violently ill and vomited. After her friend assisted the plaintiff in getting to bed, he left, and she fell asleep. The plaintiff claims that she later woke up and discovered Mr. Breedlove on top of her, in the act of sexual intercourse, and two other unknown men standing near her bed. The other individuals were later identified as Chad Griffin and Victor Kramer Gahagan. The plaintiff described feeling completely numb, and eventually lost consciousness again. She also claims that upon regaining consciousness and getting out of bed, Mr. Breedlove grabbed her from behind and pushed her into her living room, where the other two individuals were seated. The three young men left shortly thereafter.
On April 17, 2001, the plaintiff filed a petition for damages, naming as defendants Mr. Breedlove, Mr. Griffin, Mr. Gahagan, Mr. Gahagan's father, the owners of Yesterday's, and the then unknown liability insurers of those parties.[3] She alleged that Mr. Breedlove administered a drug to her which rendered her unconscious, which act was facilitated by Mr. Griffin and Mr. Gahagan, and that the three entered her residence without her consent. She further alleged that they then entered her bedroom and engaged in sexual relations with her without her consent, causing her personal injury through their "negligence and/or fault." She subsequently *569 served an amended petition identifying the insurers of Mr. Breedlove and Mr. Griffin.[4]
The three alleged tortfeasors answered the petition, as amended, denying her allegations, and also affirmatively alleged her contributory negligence and fault, including, among other allegations, that the plaintiff acted "in an openly lewd, lascivious and solicitous manner" intended to encourage sexual advances. They further affirmatively alleged that the plaintiff invited Mr. Breedlove to her residence to engage in sexual relations with her. Mr. Breedlove and Mr. Gahagan also asserted reconventional demands against Ms. Doe for defamation. The two named insurers filed separate answers, denying both liability and coverage for their insureds' alleged acts.
The two named insurers filed separate motions for summary judgment, seeking their dismissal on the grounds that their policies did not afford coverage for the acts alleged in the plaintiff's petition. The plaintiff then served a second amended petition, alleging that the three tortfeasors were intoxicated at the time of the event, and that each was negligent in failing to obtain her consent before engaging in sexual relations with her. She further alleged that Mr. Griffin and Mr. Gahagan negligently assisted Mr. Breedlove in his nonconsensual sexual relations with her, and that the three "conspired to commit the aforementioned negligent and/or intentional acts upon [her]."
The trial court heard Standard Fire's motion for summary judgment on June 2, 2003, and rendered judgment in its favor. Its summary judgment was signed on June 19, 2003, dismissing the plaintiff's cause of action against Standard Fire.[5] Ms. Doe now appeals, contending that the trial court erred in concluding that no genuine issue of material fact existed on the issue of lack of coverage by reason of the intentional character of Mr. Breedlove's alleged acts.

STANDARD OF REVIEW
The judgment from which this appeal is taken is a partial summary judgment. Appellate courts review summary judgments de novo under the same criteria that govern the trial court's consideration of whether summary judgment is appropriate. Motorola v. Associated Indemnity Corporation, 02-0716, p. 5 (La.App. 1st Cir.6/25/04), 878 So.2d 824, 828. We are authorized and, indeed, required to render a judgment "which is just, legal, and proper upon the record on appeal." La. C.C.P. art. 2164; Jackson National Life Insurance Company v. Kennedy-Fagan, 03-0054, p. 5 (La.App. 1st Cir.2/6/04), 873 So.2d 44, 48, writ denied, 04-0600 (La.4/23/04), 870 So.2d 307.

SUMMARY JUDGMENT
The summary judgment procedure is expressly favored in the law, and is designed to secure the just, speedy, and inexpensive determination of non-domestic civil actions. La. C.C.P. art. 966(A). Summary judgment is appropriate if the pleadings, depositions, *570 answers to interrogatories, admissions, and affidavits in the record show that there is no genuine issue as to material fact, and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(B).
The mover has the burden of proof that he is entitled to summary judgment. However, if the mover will not bear the burden of proof at trial on the matter at issue, then he need only point out the absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. The nonmoving party must then produce factual support sufficient to satisfy his evidentiary burden at trial. La. C.C.P. art. 966(C)(2); Simmons v. Berry, 98-0660, p. 4 (La.App. 1st Cir.12/22/00), 779 So.2d 910, 914. In doing so, the nonmoving party may not rest on the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial. La. C.C.P. art. 967(B). Failing such proof, summary judgment is proper. Id.; La. C.C.P. art. 966(C)(2).
Interpretation of an insurance contract is usually a legal question which can be properly resolved in the framework of a motion for summary judgment. Madden v. Bourgeois, 95-2354, p. 3 (La.App. 1st Cir.6/28/96), 676 So.2d 790, 792. However, summary judgment declaring a lack of coverage under an insurance policy may not be rendered unless there is no reasonable interpretation of the policy, when applied to the undisputed material facts shown by the evidence supporting the motion, under which coverage could be afforded. Gaylord Chemical Corporation v. ProPump, Inc., 98-2367, pp. 3-4 (La.App. 1st Cir.2/18/00), 753 So.2d 349, 352.

PRINCIPLES OF INSURANCE POLICY INTERPRETATION
An insurance policy is a contract between the parties, and should be construed employing the general rules of interpretation of contracts. Blackburn v. National Union Fire Insurance Company of Pittsburgh, 00-2668, pp. 5-6 (La.4/3/01), 784 So.2d 637, 641. Words in an insurance policy must therefore be given their generally prevailing meaning, unless they have acquired a technical meaning, in which case the technical meaning applies. La. C.C. art.2047; Succession of Fannaly v. Lafayette Insurance Company, 01-1355, p. 3 (La.1/15/02), 805 So.2d 1134, 1137. An insurance policy is construed as a whole, and each provision in the policy must be interpreted in light of the other provisions. Id., 01-1355 at pp. 3-4, 805 So.2d at 1137. If an ambiguity remains after applying the general rules of contractual interpretation, the ambiguous policy provision is construed against the insurer who furnished the policy's text and in favor of the insured. Id., 01-1355, at p. 4, 805 So.2d at 1138.
An insurance policy should not be interpreted in an unreasonable or strained manner so as to enlarge or to restrict its provisions beyond what is reasonably contemplated by its terms or so as to achieve an absurd conclusion. Magnon v. Collins, 98-2822, p. 7 (La.7/7/99), 739 So.2d 191, 196. Likewise, a court should not strain to find ambiguity in a policy where none exists. Gaylord Chemical Corporation, 98-2367 at p. 4, 753 So.2d at 352. An insurer has the burden of proving that a loss comes within a policy exclusion. Louisiana Maintenance Services, Inc. v. Certain Underwriters at Lloyd's of London, 616 So.2d 1250, 1252 (La.1993).

DISCUSSION
We initially address the threshold issue of whether the event forming the basis of the plaintiff's claims comes within the scope of coverage of Standard Fire's *571 policy. Standard Fire defends the trial court's judgment by asserting that the alleged event for which the plaintiff seeks recovery does not meet the policy definition of an "occurrence," and therefore simply does not fall within the contractual scope of coverage. In support of this contention, it cites this court's decision in Gaylord Chemical Corporation v. Propump, Inc., 98-2367 (La.App. 1st Cir.2/18/00), 753 So.2d 349, involving a similar policy definition equating an "occurrence" with an "accident." There, we held that "[a]ccident is defined from the viewpoint of the victim; losses that were unforeseen and unexpected by the victim are the result of an accident." Id., 98-2367 at p. 6, 753 So.2d at 354. Standard Fire contends that since the plaintiff's allegations set forth deliberate, purposeful conduct by its insured, resulting in the injuries claimed, such conduct is not an accident from her viewpoint, and no further consideration of the policy terms is necessary. In its oral reasons, the trial court agreed with this position.
We disagree. Initially, as previously observed, proper interpretation of an insurance policy requires that it be read as a whole. Secondly and more importantly, Standard Fire's argument misses the point of the Gaylord holding. The claimed injuries are alleged to have been unwelcome and unexpected from the viewpoint of the plaintiff, the victim. As such, they are obviously the result of an "accident" in terms of her expectation, regardless of her position as to the intent behind Mr. Breedlove's actions. Thus, the plaintiff is clearly claiming damages by reason of an "occurrence" as defined in the policy, and Standard Fire's coverage is applicable absent some other exclusionary language removing the event from the scope of the coverage.
Although the trial court's oral reasons were couched in terms of the event's failure to meet the threshold requirement of an "accident," a trial court's reasons for judgment, while defining and elucidating a case, form no part of the official judgment it signs and from which appeals are taken. Peters v. Harmsen, 03-1296, p. 9 (La.App. 1st Cir.4/2/04), 879 So.2d 157, 162. Regardless of the trier of fact's reasons, if a judgment is correct, it should be affirmed. Bergeron v. Watkins, 98-0717, p. 5 (La.App. 1st Cir.3/2/99), 731 So.2d 399, 402. We therefore must review other relevant provisions of the policy, including its exclusions, in order to determine the issue before us.
The policy exclusion upon which the plaintiff's argument centers is contained in a policy endorsement amending the original insuring agreement, and provides, in pertinent part:
Coverage EPersonal Liability ... [does] not apply to "bodily injury" ...
a. Resulting from an act or omission intended or expected to cause "bodily injury" . . . regardless of whether the "bodily injury" is of a different kind or degree ... than that intended or expected.[6]
This type of exclusion is commonly referred to as an "intentional act" exclusion. Generally, the purpose of an intentional act exclusion is to deny liability insurance coverage to an insured in circumstances where the insured acts deliberately *572 and intends or expects bodily injury to another. Doe v. Smith, 573 So.2d 238, 241 (La.App. 1st Cir.1990), writ denied, 573 So.2d 1139 (La.1991). It is "designed to prevent an insured from acting wrongfully with the security of knowing that his insurance company will `pay the piper' for the damages." Breland v. Schilling, 550 So.2d 609, 610 (La.1989).
In Breland, the supreme court was called upon to determine the effect of a homeowner's policy exclusion of coverage for "bodily injury ... which is either expected or intended from the standpoint of the [i]nsured." It held that the language was ambiguous, and accordingly adopted the interpretation that only those injuries that were themselves intended by the insured would be excluded, and that the applicability of the exclusion is to be determined from the subjective intent of the insured, as well as "the reasonable layman's expectations concerning the scope of his liability insurance coverage." Breland, 550 So.2d at 613.
The plaintiff contends that Breland's subjective-intent analysis is applicable here, and that genuine issue of material fact exists as to whether Mr. Breedlove intended any harm to result from his actions, in light of his allegation that the plaintiff consented or led him to believe she had consented to sexual relations. The exclusion at issue, however, differs in its language from that of Breland, in that it relates the intent or expectation to the act rather than to the character of the injury. Its express exclusion of any injury "[r]esulting from an act ... intended or expected to cause `bodily injury'," regardless of "kind or degree," seems to have been drafted with the Breland subjective-intent analysis in mind. Thus, it is questionable whether Breland provides any guidance to the resolution of this matter. But we need not attempt to distinguish Breland strictly on the basis of policy language, as the issues here are more appropriately determined by consideration of broader legal principles.
All intended wrongs have in common the element that they are inflicted without the consent of the victim. Fricke v. Owens-Corning Fiberglas Corporation, 571 So.2d 130, 132 (La.1990). The existence of consent means the defendant did not commit a tort. Landry v. Bellanger, 02-1443, p. 11 (La.5/20/03), 851 So.2d 943, 952. Where consent exists, the character of the act or omission as intentional or negligent is thus irrelevant.
In the context of Louisiana delictual law, a battery is "[a] harmful or offensive contact with a person, resulting from an act intended to cause the plaintiff to suffer such a contact." Landry, 02-1443 at p. 6, 851 So.2d at 949. The defendant's intention need not be malicious nor need it be an intention to inflict actual damage. It is sufficient if the defendant intends to inflict either a harmful or offensive contact without the other's consent. Id.
Our supreme court has defined both the words "intentional" and "act" as used in tort law. The following language from Bazley v. Tortorich, 397 So.2d 475, 481-82 (La.1981), is instructive:
The word act is used to denote an external manifestation of the actor's will which produces consequences. There cannot be an act subjecting a person to civil or criminal liability without volition.. . . The meaning of "intent" is that the person who acts either (1) consciously desires the physical result of his act, whatever the likelihood of that result happening from his conduct; or (2) knows that that result is substantially certain to follow from his conduct, whatever his desire may be as to that result. Thus, intent has references to the consequences *573 of an act rather than to the act itself. [citations omitted]
* * *
The meaning of intent in this context is that the defendant either desired to bring about the physical results of his act or believed they were substantially certain to follow from what he did.... Intent is not, however, limited to consequences which are desired. If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result. [citation omitted]
Negligence has long been defined in terms of the reasonableness of a person's conduct or belief, based upon an objective standard. Thus, it is only logical to conclude that if a person had the reasonable belief that another consented to sexual activity, the former cannot be said to be "negligent" in failing to secure absolute proof of such consent before engaging in the activity, since he was by definition acting reasonably, even if under a mistaken belief. But if the actor did not reasonably believe consent was given, or should reasonably have known that supposed consent was withdrawn, pursuing such activity clearly goes beyond negligence, by virtue of its inherent character; sexual contact can rightfully be characterized as the ultimate violation of personal physical integrity, short of death.[7]
This court, in Doe v. Smith, supra at 243, held that child molestation "cannot result from careless conduct" and can only be intentional, thus establishing that intent is to be inferred from such an act. There, the policy intentional act exclusion provided that the insurer did not cover "bodily injury . . . which may reasonably be expected to result from the intentional or criminal acts of an insured person or which are in fact intended by an insured person." We held that the psychological injury, emotional pain, and impaired family relations alleged by the victim's parents on her behalf were clearly "the kind of consequences an objective reasonable person might expect as a result of [the] deliberate acts of molestation." Id. at 244.
In Doe v. State, Department of Health & Human Resources, 623 So.2d 72 (La.App. 1st Cir.), writ denied, 627 So.2d 653 (La. 1993), we were called upon to determine the effect of a Breland-type "expected or intended" exclusion in a case of alleged molestation of a mentally handicapped adult. We extended the "inferred intent" rationale of Doe v. Smith, regarding the act itself, to the sexual molestation of a mentally impaired adult. However, we went further and held that the insured's intent as to the consequences of his intentional act was to be judged by the standard of an objective reasonable person, rather than a "subjective intent" standpoint. Id. at 74.
In the case of Yount v. Maisano, 627 So.2d 148 (La.1993), the insured defendant and the plaintiff had both been drinking all day at a beach with separate groups of friends and were intoxicated. At the conclusion of a series of confrontations, the defendant jumped the plaintiff from behind, knocked him down, punched him with both fists ten to fifteen times, and kicked him at least twice, once in the face. (The kicks were so violent that the defendant injured his foot.) The plaintiff sustained multiple jaw fractures, broken teeth, and *574 other injuries. The defendant's policy excluded injury "which is expected or intended by the insured." The defendant claimed that he did not intend or consciously desire to seriously injure the plaintiff, and was acting in a "furious frenzy." The court held that while the insured's testimony as to his subjective intent is one factor to be considered, a court must consider "all the facts and circumstances bearing on such intent or expectation" in the record. Id. at 152. The court distinguished Breland, however, and held that the particular injuries were all "either subjectively intended or expected injuries," and that "[a] reasonable insured could not reasonably expect his insurance policy to pay for the consequences of such a fierce and brutal beating." Id. at 153. The court further stated:
We hold that where an insured sets out to commit a battery on another individual and repeatedly strikes him in the face with both fists and kicks him repeatedly in the face, the resulting broken facial bones and other facial injuries are either intended by the insured or the insured must know that such injuries are substantially certain to result.

Id. (emphasis added)[8]
Finally, in Belsom v. Bravo, 94-876 (La. App. 5th Cir.4/25/95), 658 So.2d 1304, writ denied, 95-1327 (La.9/1/95), 659 So.2d 737, the plaintiff alleged she was sexually assaulted at her home by the insured defendant, who had seen her earlier at a bar and had been steadily drinking. Citing with approval this court's cases of Doe v. Smith, supra, and Doe v. State, Department of Health & Human Resources, supra, and reviewing other states' jurisprudence, the author expressly extended the doctrine of inferred intent "to a sexual assault matter involving young adults, ages 17 [the plaintiff] and 18 [the defendant]." Belsom, 94-876 at pp. 4-5, 658 So.2d at 1306. He further held that the inferred intent rule applied to all sexual assault cases, regardless of the victim's age, meaning "that not only is the act of sexual assault intentional as a matter of law, but the resulting harm is intentional as a matter of law." Belsom, 94-876 at p. 8, 658 So.2d at 1308.[9]
We can find no authority in this state for recognition of a cause of action for negligent initiation of sexual advances or negligent infliction of sexual intercourse (let alone "conspiracy" to commit those negligent acts), and decline to recognize such novel theories in the context of this case.[10] To do so would seemingly open the floodgates for a tidal wave of trivial or frivolous "morning after" claims by parties seeking compensation for their own amorous folly or loss of inhibitions through voluntary intoxication, not to mention cases of outright fraud. Mutual consent is the hallmark of normal sexual relations between responsible adults; irresponsible behavior in either failing to discern a partner's consent or in granting one's consent does not change the intentional character of the act and its result. Our law provides *575 that voluntary intoxication is a defense to a criminal charge only in limited situations. La. R.S. 14:15(2).[11] There is even less reason to consider it a defense in a civil case arising from an alleged intentional tort. It certainly may be negligent to allow oneself to become intoxicated and uninhibited from committing an intentional tort, but the tort must still be considered intentional.
On the one hand, an argument may be made that there should be no public policy against insurance coverage for sexual battery, if the policy language is framed in terms of the insured's subjective intent, and that "allowing victims of such intentional acts to be compensated serves a public purpose of protecting innocent victims." 7 Lee R. Russ & Thomas F. Segalla, Couch on Insurance 3rd § 101:25 (2003). On the other hand, there are jurisprudential authority and solid policy reasons for recognition of the doctrine of inferred intent in cases such as this. As to public policy considerations, potential instances of "date rape" might very well be encouraged if precedent were established for liability insurance coverage for such an act, based upon a claim of subjective "negligence" in comprehending the victim's consent. As previously noted, a similar policy consideration forms the basis of all "intentional act" exclusions in liability insurance policies. No reasonable insured could expect there to be coverage under a liability insurance policy for such a despicable act as rape, sexual battery, or "date rape." Louisiana Civil Code article 2323(C) embodies the public policy of this state that an intentional tortfeasor cannot invoke the contributory negligence of his victim as a defense to a claim for damages. Similar considerations of public policy weigh against recognition of the plaintiff's alternate theory of recovery based upon negligence.[12]
In our view, there is no logical, compelling, or justifiable reason to consider the intent behind the sexual battery of an adult any differently from that behind the sexual molestation of a minor. We therefore agree with the author of the Belsom opinion that as to the injuries or damages resulting from a sexual battery or rape, intent should be inferred for purposes of applying an "intentional act" exclusion.[13]
*576 In extending the doctrine of inferred intent to the circumstances of this case, we do not necessarily establish or recognize a new principle of law; rather, we apply well-established concepts and decline to recognize the novel theories of recovery advanced by the plaintiff, resting upon a tenuous and insubstantial foundation defying application of common sense.[14] In short, under the allegations of the plaintiff's petition and based upon the evidence submitted, if a tort was committed by the insured, it had to be an intentional tort, and its consequences to the victim must necessarily have been either intended or expected from the standpoint of the insured as a matter of law. The injuries claimed by the plaintiff cannot be viewed as the unintended or unexpected consequences of an intentional act; the offensive contact was an expected, inseparable component of the act itself.[15] We agree with *577 Judge Bowes's observation in Belsom that consent and intent are "inextricably linked issues in situations involving adult victims [of sexual assault]," and that "in order to infer intent, it is necessary . . . to infer the (lack of) consent." Belsom, 94-876 at p. 2, 658 So.2d at 1308 (Bowes, J., concurring opinion). But consent is an absolute defense in a sexual assault case; if no intentional tort was committed, then no tort was committed. Under either scenario, there is no reasonable interpretation of the policy language which would afford coverage under Standard Fire's policy.
In Shaw v. Bourn, 615 So.2d 466 (La. App. 4th Cir.), writ denied, 618 So.2d 409 (La.1993), the Fourth Circuit rejected the argument that an intentional act exclusion did not apply if the insured subjectively believed that child molestation caused no harm to children, and adopted this court's holding in Doe v. Smith, supra, that child molestation cannot result from negligence as a matter of law, but only from an intentional act. It accordingly reversed a jury verdict finding the molestation to be a negligent rather than an intentional act, holding that the trial court committed reversible error in submitting the coverage question to the jury. But see Pradillo v. Allstate Insurance Company, 96-1294 (La. App. 4th Cir.7/17/96), 677 So.2d 1124.
We characterize this case, as the Fourth Circuit characterized Shaw, as "a case about personal responsibility." Shaw, 615 So.2d at 471. Whose responsibility, however, as between Ms. Doe and the alleged tortfeasors, we leave for the trier of fact.

DECREE
The summary judgment of the trial court in favor of the defendant-appellee, The Standard Fire Insurance Company, and against the plaintiff-appellant, Jane Doe, dismissing her claims against it with prejudice, is affirmed. All costs of this appeal are assessed against the plaintiff-appellant, Jane Doe.
AFFIRMED.
GUIDRY and McCLENDON, JJ., concur.
NOTES
[1] "Jane Doe" is a pseudonym used by the plaintiff in her pleadings in lieu of her real name, in order to protect her identity due to the nature of her claims. The record of this action was also ordered to be sealed by the trial court in order to preserve that confidentiality.
[2] Rohypnol ("Roofies"), or flunitrazepam, is an illegal controlled drug used to facilitate "date rape" and other crimes upon unknowing victims to whom it is administered. See La. R.S. 40:964(IV)(34) and 40:969.
[3] The plaintiff later voluntarily dismissed Mr. Gahagan's father as a party defendant.
[4] Standard Fire was misidentified therein as "Travelers Insurance Company," and later substituted as defendant in the latter's place.
[5] Although the judgment was later formally designated by the trial court as a final judgment on Standard Fire's motion, such action was technically unnecessary, as the summary judgment dismissing Standard Fire as a party defendant constituted a final partial judgment by definition. La. C.C.P. arts.1911, 1915(A)(1), (3); Motorola, Inc. v. Associated Indemnity Corporation, 02-0716, pp. 10-11 (La.App. 1st Cir.4/30/03), 867 So.2d 715 (en banc).
[6] The original exclusion simply provided:

Coverage EPersonal Liability ... [does] not apply to "bodily injury" . . .:
a. Which is expected or intended by the insured.
In her brief, the plaintiff mistakenly assumes that the original exclusionary language remained effective. As will be seen, however, we would reach the same result herein under either version.
[7] See Duplechain v. Turner, 444 So.2d 1322, 1326 (La.App. 4th Cir.), writ denied, 448 So.2d 114 (La.1984).
[8] See also Great American Insurance Company v. Gaspard, 608 So.2d 981 (La.1992); Horde v. Foucha, 396 So.2d 441 (La.App. 4th Cir. 1981); Monk v. Veillon, 312 So.2d 377 (La. App. 3rd Cir.1975).
[9] The two other panel members of the court concurred in the result only, but rejected the extension of the doctrine of inferred intent to cases involving adults.
[10] A leading insurance law commentator notes that "[c]ounsel for claimants have attempted to circumvent the intentional acts exclusion and related public policy arguments by creatively designing a sexual abuse cause of action in terms of negligence; this has not generally been viewed favorably by the courts." 7 Lee R. Russ & Thomas F. Segalla, Couch on Insurance 3rd § 101:25 (2003).
[11] The plaintiff's petition sets forth facts which incorporate all the essential elements of the crimes of forcible rape, La. R.S. 14:42.1; simple rape, La. R.S. 14:43; sexual battery, La. R.S. 14:43.1; simple battery, La. R.S. 14:35; and mingling harmful substances, La. R.S. 14:38.1. Voluntary intoxication is a defense to these crimes only if it is of such a degree as to render a defendant both unconscious of his actions and physically unable to act, as they are predicated upon "general criminal intent," rather than "specific criminal intent." La. R.S. 14:10, 11; State v. Rives, 407 So.2d 1195, 1197 (La.1981).
[12] A cause of action for intentional infliction of mental distress, without physical injury, is predicated upon the defendant's "extreme and outrageous conduct" performed "intentionally or recklessly." Moresi v. State, Department of Wildlife and Fisheries, 567 So.2d 1081, 1095 (La.1990). We note that a cause of action for negligent infliction of mental distress unaccompanied by physical injury, however, is recognized in only very limited situations. Id. at 1095-96. Our decision in this regard is further supported by Louisiana's longstanding refusal to recognize a cause of action for alienation of a spouse's affections, whether grounded in either intentional tort or negligence theory. See Greene v. Roy, 604 So.2d 1359, 1361-62 (La.App. 3rd Cir.), writ denied, 607 So.2d 544 (La.1992).
[13] In the case of West Virginia Fire & Casualty Company v. Stanley, 216 W.Va. 40, 602 S.E.2d 483 (W.Va.2004), involving an alleged sexual assault committed by a minor upon another minor, the West Virginia supreme court of appeals held that the age of the actor was irrelevant for purposes of inferring the intent to cause injury. Although that court held that the alleged sexual contact did not constitute an "occurrence" or "accident" under the policy, it also expressly held that the conduct was excluded under the policy's "intentional act" exclusion, extending its earlier inferred intent rule in sexual abuse cases involving adult actors to minor actors, extending the scope of an earlier decision:

[T]he intent to cause some injury will be inferred as a matter of law in a sexual misconduct liability insurance case, due to the nature of the act (the alleged sexual contact), which is so inherently injurious, or "substantially certain" to result in some injury, that the act is considered a criminal offense for which public policy precludes a claim of unintended consequences, that is, a claim that no harm was intended to result from the act.
[Horace Mann Insurance Company v.] Leeber, 180 W.Va. [375,] 379, 376 S.E.2d [581,] 585 [(W.Va.1988)]. [emphasis in original] Because our adoption of the inferred-intent rule in sexual abuse cases is based on the inherently injurious nature of the wrongful sexual act, the age of the actor is irrelevant. In other words, the nature of the wrongful act and the injury to the victim are the same, regardless of whether the perpetrator is a minor or an adult.
Id. at 494, 376 S.E.2d 581. (emphasis in original) If the age of the actor is irrelevant for purposes of application of the doctrine of inferred intent, then it only stands to reason that the age of the victim should likewise be irrelevant for that purpose. See also Rulli v. State Farm Fire & Casualty Company, 479 N.W.2d 87, 89 (Minn.App.1992).
[14] We find it rather difficult to imagine the sort of discussion which would be involved in a conspiracy to commit negligence, as distinguished from a conspiracy to conceal negligence already committed. (For example, would such discussion conclude with a statement such as: "It's agreed; we'll all be negligent"?) Any such conspiracy would seem to rise to the status of an intentional tort upon the commission of the act or omission causing damages.
[15] As observed by one commentator, "[t]he nature of many liability insurance losses is such that it is almost always possible to theoretically separate the activity which was occurring at the time of the loss . . . from some related but antecedent or concurrent activity that arguably contributed to the loss . . . ." 7 Lee R. Russ & Thomas F. Segalla, Couch on Insurance 3rd § 101:60 (2003) (emphasis added). The same authority also makes the following observation:

A similar situation . . . involves claims that "negligence" in failing to obtain treatment for a mental or sexual disorder is a separate risk from the excluded intentional acts that ultimately result from the disorder: assault, sexual abuse, and the like. These are rarely successful, especially since the underlying mental condition produces no legal liability until there are damages, and the damages are always inextricable from the excluded intentional act. [Footnote omitted.]
Id. (emphasis added). We perceive no practical distinction between the foregoing claims and the plaintiff's negligence claim here. Mr. Breedlove's alleged negligence in failing to obtain the plaintiff's consent tongage in sexual activity cannot be considered a separate risk from the nonconsensual sexual contact also alleged, since the failure to obtain consent cannot result in liability without damages, and the damages are inextricable from the nonconsensual sexual contact, the intentional act.