644 So.2d 206 (1994)
Michael A. ROPPOLO, III, et al.
v.
Rev. Charles Burney MOORE, M.D., et al.
No. 93-C-2361.
Court of Appeal of Louisiana, Fourth Circuit.
July 27, 1994.
Rehearing Denied November 15, 1994.
Raymond P. Ward, Louis Leonard Galvis Sessions & Fishman, New Orleans, for relator.
George B. Recile, Ray A. Benitez, III, New Orleans, for respondent.
Before SCHOTT, C.J., and BYRNES, and JONES, JJ.

ON APPLICATION FOR WRITS
BYRNES, Judge.
In the early morning hours of July 29, 1990 Anna Pineiro-Roppolo committed suicide. Michael A. Roppolo, III, Anna's widower sued Rev. Charles Burney Moore, M.D., in his capacity as a physician and in his capacity as an Episcopal Priest[1] for negligence *207 in connection with his wife's suicide. As set forth in footnote one below, plaintiff's petition contains allegations against Dr. Moore in his capacity as a priest concerning his sexual conduct, spiritual counseling, spiritual services, spiritual injury, and violations of scriptural and church standards. However, all of these allegations boil down to a claim for clergy malpractice. Mr. Roppolo sued the Episcopal Diocese because of its relationship to Dr. Moore.[2],[3]
The Episcopal Diocese filed a peremptory exception of no cause of action and a declinatory exception of lack of subject matter jurisdiction as well as a motion for summary judgment on the grounds that Louisiana does not recognize a claim for clergy malpractice. The trial court ruled against the Episcopal Diocese on both of the exceptions and the motion for summary judgment. The Episcopal Diocese applied for writs which this *208 Court hereby grants in order to review the judgment of the district court.

LOUISIANA DOES NOT RECOGNIZE A CAUSE OF ACTION FOR CLERGY MALPRACTICE
Plaintiff's allegations against Dr. Moore while acting in his capacity of Episcopal Priest, attempt to state a claim for clergy malpractice. To date, no court has acknowledged the existence of a separate cause of action for the malpractice of a clergy member while acting within a clerical capacity. Liability of the Church for the Sexual Misconduct of Church Leaders, 39 Loyola Law Rev. 313, 314 (1993); Annotation, Cause of Action for Clergy Malpractice, 75 A.L.R.4th 750, 752 (1990).
This Court believes that the exercise of its supervisory powers should be liberally invoked where First Amendment freedoms are at stake. The exercise of First Amendment rights should not be discouraged by the threat of harassing lawsuits. Mashburn v. Collin, et al, 355 So.2d 879 (La.1977).
In Mashburn v. Collin, supra, the Louisiana Supreme Court encouraged the use of summary proceedings as a device for minimizing the threat of harassing lawsuits or the exercise of First Amendment freedoms.
Summary adjudication may be thought of as a useful procedural tool and an effective screening device for avoiding the unnecessary harassment of defendants by unmeritorious actions which threaten the free exercise of rights of speech and press. Id. at 891.
This threat of harassing lawsuits is known as the "chilling effect." The same threat applies equally to the First Amendment right of the free exercise of religion. The United States Supreme Court has recognized the constitutional dangers posed by such "chilling effect" for over one hundred years. In Watson v. Jones, the court stated:

Watson v. Jones, 13 Wall. 679, 729, 20 L.Ed. 666 (1871).... It would therefore also be inappropriate and unconstitutional for this Court to determine after the fact that the ecclesiastical authorities negligently supervised or retained the defendant Bishop. Any award of damages would have a chilling effect leading indirectly to state control over the future conduct of affairs of a religious denomination, a result violative of the text and history of the establishment clause. U.S. Const. amend. I. [Emphasis added]. Watson v. Jones, 80 U.S. 679, 20 L.Ed. 666, 13 Wall. 679 (1871).
Plaintiff complains about the adulterous sexual relationship between the decedent and Dr. Moore and the effect that relationship may have had on the decedent's mental state as a cause of her suicide. But they were both adults. As there is no civil nor criminal prohibition against such conduct between adult laypersons the State cannot penalize such conduct because Dr. Moore was an Episcopal priest. Strock v. Pressnell, 38 Ohio St.3d 207, 527 N.E.2d 1235 (1988). To do so would require this Court to determine the standards of the Episcopal Church and then put the weight of the State behind those standards or to require a different standard of behavior of the clergy, neither of which is permissible.
Plaintiff in his petition invokes the Ninth Commandment, the Sixth Commandment, the Canons of the Episcopal Church of America, and the Rubrics of the Book of Common Prayer, etc. This Court has no right to interpret religious doctrine, Minker v. Baltimore Annual Conference of United Methodist Church, 894 F.2d 1354, 1358-59 (D.C.Cir.1990), nor standards of religious behavior. What may be viewed as sexual misconduct by one religion may be permitted or even encouraged by another. To do as plaintiff requests would require this Court to apply different standards to different litigants depending on their religious affiliations. This is a secular court. If sexual or other conduct of a priest violates secular standards, e.g., child molestation, this Court will impose whatever civil or criminal secular sanctions may be appropriate. But this Court has no authority to determine or enforce standards of religious conduct and duty.
The court in Schmidt v. Bishop, 779 F.Supp. 321 (S.D.N.Y.1991), explained why *209 this Court cannot adjudicate plaintiff's claims against Dr. Moore in his capacity of Episcopal priest:
It would be impossible for a court or jury to adjudicate a typical case of clergy malpractice, without first ascertaining whether the cleric, in this case a Presbyterian pastor, performed within the level of expertise expected of a similar professional (The hypothetical "reasonably prudent Presbyterian pastor"), following his calling, or practicing his profession within the community. See Restatement (Second) of Torts Section 299A. As the California Supreme Court has held in Nally v. Grace Community Church of the Valley [47 Cal.3d 278, 253 Cal.Rptr. 97, 763 P.2d 948 (1988)]:
"Because of the differing theological views espoused by the myriad of religions in our state and practiced by church members, it would certainly be impractical, and quite possibly unconstitutional to impose a duty of care on pastoral counselors. Such a duty would necessarily be intertwined with the religious philosophy of a particular denomination or ecclesiastical teachings of the religious entity."
Nally, 253 Cal.Rptr. at 109, 763 P.2d at 960.
This Court agrees with Nally, and regards the unconstitutionality as more than possible. It is real. The Supreme Court in the much maligned case of Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), forbade the state to "foster excessive government entanglement with religion," Id. at 614-15, 91 S.Ct. at 2112, as violative of the First Amendment.... Any effort by this Court to instruct the trial jury as to the duty of care which a clergyman should exercise, would of necessity require the Court or jury to define and express the standard of care to be followed by other reasonable Presbyterian clergy of the community. This in turn would require the Court and the jury to consider the fundamental perspective and approach to counseling inherent in the beliefs and practices of that denomination. [Emphasis added]. This is as unconstitutional as it is impossible. It fosters Schmidt v. Bishop, supra, 779 F.Supp. at 327-28.
What it comes down to as the court noted in Nally is that "the secular state was not equipped to ascertain the competency of counseling when performed by those affiliated with religious organizations." Nally, supra, 253 Cal.Rptr. 97, 109, 763 P.2d 948, 960. For purposes of reviewing the exception of no cause of action we accept as true all of the factual allegations of plaintiff's petition. However, for the reasons stated above this Court recognizes no cause of action for clergy malpractice. As all claims asserted by plaintiff against Dr. Moore in his capacity of Episcopal priest,[4] are grounded in clergy malpractice they fail to state a cause of action. As plaintiff has failed to state a cause against Dr. Moore in his capacity of Episcopal Priest there can be no claim against the Episcopal Diocese based on any theory of responsibility for Dr. Moore's actions. Strock v. Pressnell, 38 Ohio St.3d 207, 527 N.E.2d 1235, 1244 (1988).
This was explained well in the Schmidt case, supra:
Furthermore, any inquiry into the policies and practices of the Church Defendants in hiring or supervising their clergy raises the same kind of First Amendment problems of entanglement discussed above, which might involved the Court in making sensitive judgments about the propriety of the church Defendants' supervision in light of their religious beliefs.... The traditional denominations each have their own intricate principles of governance, as to which the State has no rights of visitation. Church governance is founded in scripture, modified by reformers over almost two millennia [sic]. As the Supreme Court stated long before the Lemon formulation was developed:
It is not to be supposed that the judgment of the civil courts can be as competent *210 in the ecclesiastical law and religious faith of all these bodies as the blest men in each are in reference to their own. It would therefore be an appeal from the more learned tribunal in the law which should decide the case, to one which is less so. Schmidt, supra, 779 F.Supp. at 332.
The Ohio Supreme Court in Byrd v. Faber, 57 Ohio St.3d 56, 565 N.E.2d 584 (1991), expressed similar reservations:
In order to determine whether a religious organization has exercised due care in hiring, it is necessary to examine its employment policies and practices. In all probability, these policies will be infused with the religious tenets of the particular sect involved. If the state becomes involved in assessing the adequacy of these standards, serious entanglement problems may arise under the First Amendment. See, Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745. Byrd v. Faber, supra, 57 Ohio St.3d at 61, 565 N.E.2d at 590.
The First Amendment of the United States Constitution and Article 1, Sec. 4 of the Louisiana Constitution both guarantee religious freedom and have been interpreted to forbid courts from interfering in the ecclesiastical matters of religious groups. The Serbian Eastern Orthodox Diocese for the U.S. and Canada v. Milivojevich, 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976); Wilkerson v. Battiste, 393 So.2d 195 (La.App. 1 Cir.1980). This prohibition extends to matters of religious discipline, faith or custom, as well as to the appointment and removal of ministers. Milivojevich, supra; Joiner v. Weeks, 383 So.2d 101 (La.App. 3d Cir.1980).
For the foregoing reasons we find that plaintiff has failed to state a cause of action against the Episcopal Diocese. We reverse the judgment of the trial court and render judgment dismissing the Episcopal Diocese of Louisiana from this suit.
REVERSED AND RENDERED.
JONES, J., concurs with reasons.
JONES, Judge, concurring with reasons.
I completely disagree with the conclusion reached by the majority that the trial court erred when it overruled the Diocese's exceptions of no cause of action and lack of subject matter jurisdiction. The allegations of the petition are sufficient to state a cause of action and the First Amendment is not implicated.
Nevertheless, the uncontroverted evidence submitted with the Diocese's motion for summary judgment supports a finding that the trial court should have granted the Diocese's motion for summary judgment.
Plaintiff's claim against the Diocese is basically a claim for the negligent hiring and supervision of Dr. Moore. However, the plaintiff has not alleged or demonstrated any facts to support a finding that the Diocese hired, supervised, or cloaked Dr. Moore with any authority to act as a counselor. Dr. Moore was not a pastor for any particular parish, nor was he compensated by the Diocese for any services. His area of expertise was apparently moral theology and there is no indication that he held himself out to be a counselor or more importantly, that the Diocese represented him to be a counselor. This case appears to be the only case wherein defendant allegedly acted as a "spiritual counselor" for any individual.
The decedent and Dr. Moore obviously had a physician-patient relationship, a professional relationship resulting from their jobs at Ochsner Hospital, and a social relationship. However, the documents submitted with the Diocese's motion for summary judgment established that no priest-parishioner relationship ever existed between Dr. Moore and the plaintiff's deceased wife. Indeed, the uncontroverted evidence also shows that the defendant was an Episcopalian priest while the deceased and her husband were Roman Catholics.
More importantly, plaintiff's petition contains no allegation of any conduct on the part of Dr. Moore which would have placed the Diocese on notice of any defects in character on the part of the defendant. The uncontroverted affidavits and depositions submitted with the Diocese's motion for summary judgment demonstrate that the adulterous relationship between the plaintiff's deceased wife and the defendant apparently occurred after *211 he was ordained, was the only adulterous relationship he engaged in, and was not known by the Diocese.
Irrespective of whether a cause of action for clergy malpractice exists, the Diocese could not be held liable to the plaintiff under the circumstances of this case. Based upon the documents submitted in support of the Diocese's motion for summary judgment, I would reverse the trial court and grant the motion for summary judgment since no genuine issues of material fact exists in this case and the Diocese is entitled to a judgment as a matter of law.
Accordingly, I concur in this court's dismissal of the Diocese from this litigation.
NOTES
[1] Plaintiff's petition contained the following allegations:

COUNT 1Negligence Based On Defendant Moore's Capacity As A Priest
46.
Plaintiff reavers all the allegations contained in paragraphs 1 through 45 as if stated herein.
47.
Defendant Moore in his capacity as a priest provided spiritual counseling, direction and support and faith to Anna Pineiro-Roppolo, during all material times herein. [Emphasis added]
48.
Anna Pineiro-Roppolo thought of and believed in Defendant Moore as a priest. [Emphasis added]
49.
During all material times herein, Defendant Moore allowed and encouraged Anna Pineiro-Roppolo to become emotionally dependant upon him to her detriment and the detriment of her marital relationship.
50.
During all material times herein, Defendant Moore engaged in a sexual relationship with Anna Pineiro-Roppolo to his benefit and to her severe detriment and to the detriment of her marital relationship. [Emphasis added]
51.
Defendant Moore is liable to Plaintiff for, among others, the following reasons:
a. Taking advantage of an emotionally unstable recipient of his spiritual services who was susceptible to the transference process; [Emphasis added]
b. Causing spiritual injury to Anna Pineiro-Roppolo; [Emphasis added]
c. Engaging in a sexual relationship with Anna Pineiro-Roppolo to her detriment and to the detriment of her marriage; [Emphasis added]
d. Encouraging a dependence relationship with Anna Pineiro-Roppolo to her detriment and to the detriment of her marriage; [Emphasis added]
e. Failure to refer Anna Pineiro-Roppolo to another clergyman for spiritual counseling; [Emphasis added]
f. Continuing the sexual relationship with Anna Pineiro-Roppolo; [Emphasis added]
g. Violating the Ninth Commandment, "Thou shalt not covet they neighbor's wife," and thus increasing Anna Pineiro-Roppolo's feelings of guilt, relating to her strong religious beliefs; [Emphasis added]
h. Violating the Sixth Commandment, "Thou shalt not commit adultery," and thus increasing Anna Pineiro-Roppolo's feelings of guilt, relating to her strong religious beliefs; [Emphasis added]
i. Use of his position as a clergyman to deceive Plaintiff Michael A. Roppolo into believing that Defendant Moore's interests in Anna Pineiro-Roppolo were ethical, honest, in her best interest, and were not sexual and to the detriment of Anna and her marital relationship; [Emphasis added]
j. Undue familiarity and unprofessional conduct with Anna Pineiro-Roppolo; [Emphasis added]
k. Violation of Canons of the Episcopal Church of America and the Rubrics of the Book of Common Prayer; [Emphasis added]
1. Any and all other acts and/or omissions and/or negligence and/or deviations from the standard of care/practice of an ordained Episcopal priest yet to be discovered and proven at the trial of this matter. [Emphasis added]
[2] Diocese is liable to Plaintiff for, among others, the following reasons:
a. Vicarious liability as the principal of Defendant Moore and with direction and control over the services provided by defendant Moore to Anna Pineiro-Roppollo;
b. Failure to investigate and/or adequately investigate Defendant Moore as to his emotional, psychological, and moral fitness to be a minister of the Episcopal Church;
c. Placing Defendant Moore in a position wherein Anna Pineiro-Roppolo could receive spiritual services from Defendant Moore, and all that flowed therefrom;
d. Failure to adequately train and prepare Defendant Moore for the ministry;
e. Failure to adopt and/or enforce the Cannons of the Episcopal Church of America;
f. Any and all other acts and/or omissions and/or negligence and/or deviations from the standard of care yet to be discovered and proven at the trial of this matter.
[3] Ochsner Clinic Inc., A Professional Medical Corporation, Alton Ochsner Medical Foundation, Ochsner Foundation Hospital, and ABC Insurance Company/ies were also named as defendants.
[4] This Court has not considered plaintiff's claims a doctor, against Dr. Moore in his capacity of a layman or a doctor.