CHEHARDY, C.J.
*822 This appeal arises out of the alleged sexual misconduct of an ordained Lutheran minister, which purportedly occurred during counseling sessions with a parishioner. Plaintiff, Lori Pelitire ("Pelitire"), appeals the trial court's March 21, 2018 judgment rendered in favor of defendants, Craig Wayne Rinker ("Rinker"), First English Lutheran Church ("FELC"), and its insurer, Church Mutual Insurance Company ("CMIC"), granting defendants' motion for summary judgment and dismissing all claims asserted by Pelitire against them, with prejudice, and dismissing Pelitire's cross-motions for partial summary judgment against Rinker, FELC and CMIC as moot. For the reasons that follow, we affirm the trial court's judgment in part, reverse in part, and remand for further proceedings.
FACTUAL BACKGROUND AND PROCEDURAL HISTORY
Pelitire, a forty-six-year old, single woman,[1] alleges that Rinker, while acting in his capacity as an ordained minister employed by FELC, committed lewd and lascivious sexual acts upon her and, thus, is liable to her for negligent counseling, negligent infliction of emotional distress, intentional infliction of emotional distress, sexual assault, and sexual battery. Pelitire further avers that FELC, and its insurer, CMIC, are liable to her for its vicarious liability, as well as its negligent hiring of Rinker and its failure to properly supervise and train him.
Rinker, thirty years Pelitire's senior, is an ordained Lutheran minister. He first retired from public ministry in 2000. From 1994 through 2011, Rinker was employed by Concordia University Wisconsin, New Orleans Center. In 2013, Rinker returned to ministry part-time and, at the time of the acts sued upon herein, was employed by FELC as one of four "supply" pastors. While working for FELC, Rinker engaged in parish ministry until his voluntary resignation in 2015, shortly before the filing of the instant suit.
Pelitire and Rinker first met in or about 2004 in connection with a seminar hosted by Pelitire's company, Y Solutions, wherein Rinker was a guest speaker.[2] Pelitire was working as an audio-visual technician in connection with the seminar and was tasked with assisting in the preparation of Rinker's resume. Then, in 2005, Rinker reached out to Pelitire for the first time since the seminar and offered her a position as his assistant at Concordia University, an offer she declined. Subsequently, there was no contact between the parties until three years later in 2008, when Pelitire sent Rinker a friend request on Facebook, which he accepted. Over the next five years, the parties communicated intermittently on Facebook.
In June 2013, Pelitire sent a private message via Facebook to Rinker, whom she knew to be an ordained minister, asking for prayers and spiritual guidance due to an upcoming surgery she had scheduled. At this time, Rinker was retired from Concordia University and had only recently returned to active ministry working as a *823 "supply" pastor for FELC.[3] Following Pelitire's surgery, the parties began to regularly communicate via Facebook, email and, eventually, in person.
The record reflects that between July 2013 and August 2014, Pelitire and Rinker exchanged nearly 1,500 emails. Their email correspondence evidences a relationship where the parties freely and openly discussed an array of both personally intimate and innocuous topics. For many years prior to July 2013, Pelitire had a history of dealing with several health-related issues, chronic anxiety, and panic attacks. At some point, both parties began to refer to Rinker as Pelitire's "life coach."
In addition to their voluminous email correspondence, Rinker weekly visited Pelitire at her home where together they would watch television, share meals, and grocery shop. There were weeks when Rinker would visit Pelitire's home, whom she shared with her 88-year-old aunt, up to three times. During one visit, Pelitire voluntarily removed her shorts and allowed Rinker to inspect a boil on her buttocks located near her anus. On another occasion, they discussed the possibility of Rinker taking artistic nude photographs of Pelitire so that she could "memorialize" her 42-year-old body. Pelitire and Rinker also spoke often on the phone. The parties exchanged gifts with one another. Rinker purchased a vibrator for Pelitire. Once, the parties accompanied one another to a blood lab where they both had tests pending. On another occasion, Pelitire met Rinker at a car dealership in order to take his photograph for use at a local civic event. Rinker would sometimes give money to Pelitire, bring her food, and run errands for her and/or her elderly aunt.
In early August 2014, Rinker was gambling and failed to appear on time for a scheduled home visit with Pelitire, who was then experiencing extreme anxiety relating to her terminally ill cat. According to Pelitire, Rinker's failure to timely show up caused her to "awaken" to the truth that Rinker was a "fraud" and that his counseling had turned into sexual abuse. Shortly thereafter, the parties ceased all communication.
On April 2, 2015, Pelitire filed suit against Rinker, FELC, and its insurer, CMIC, seeking damages and alleging that, while still a virgin and in an emotionally vulnerable state of mind, she was sexually assaulted and battered by Rinker. Pelitire alleged that on each occasion of sexual misconduct, Rinker was acting in the course and scope of performing his duties as a Lutheran minister for FELC, where Pelitire averred she was a parishioner.[4] Specifically, Pelitire claimed that while calling on her at her home to provide "counseling," administer communion, and offer prayers, Rinker abused his position as a minister by exerting undue influence over her and committing lascivious sexual acts upon her all at a time when she "sought the comfort, guidance and religious counseling of a Lutheran Minister who she had reason to trust and [to whom] she reached out for assistance." Pelitire asserted that FELC was aware that Rinker *824 was counseling her and was paying him to do so.[5]
Though these "counseling sessions" commenced during the summer of 2013, in her petition Pelitire stated that Rinker "committ[ed] his sexual acts from April 2, 2014 through August 8, 2014," during which time he claimed to be helping her to build up her self-esteem and self-confidence. According to Pelitire, as a part of Rinker's counseling and acting as her "life coach," Rinker would "touch [her] breasts and commit oral sex on her in what he claimed was part of her religious counseling and recovery," and he "assured her these were valid methods of counseling" and that he was "grooming" her for a future mate. In short, Pelitire alleged that "during religious 'counseling' appointments" Rinker abused his position of authority as her minister and counselor to gain sexual favors from her and exploited her preexisting anxiety disorder and physical ailments about which Rinker was aware.
As to Rinker, Pelitire sought damages for his negligent counseling, negligent infliction of emotional distress, intentional infliction of emotional distress, sexual assault, and sexual battery. As to FELC, Pelitire sought damages for its vicarious liability and for its negligent hiring, training and supervising Rinker.[6]
On February 16, 2018, Pelitire filed motions for partial summary judgment against Rinker and against FELC averring there was no genuine issue of material fact as to their respective liability. To support her motions, Pelitire attached several of the approximately 1,500 emails exchanged between herself and Rinker from July 2013 to August 2014, FELC's responses to discovery, and excerpts from FELC's 1442 corporate deposition. Pelitire also attached monthly emails from Rinker to FELC dating from July 2013 to August 14, 2014, wherein Rinker reported his monthly hospital visits, home visits, communion calls and the other monthly activities he performed for FELC. Additionally, Pelitire attached excerpts from Rinker's deposition and her affidavit, as well as the report of her expert, Gary R. Shoener, a clinical psychologist, and excerpts from his deposition.[7]
On February 17, 2016, Rinker, FELC, and CMIC filed a cross motion for summary judgment alleging they were entitled to summary judgment as a matter of law dismissing Pelitire's claims against them because the allegations in Pelitire's petition set forth a claim for clergy malpractice, a cause of action which Louisiana does not recognize. FELC posited that absent a *825 viable negligence claim against Rinker, Pelitire's claims against FELC for its vicariously liability and negligence likewise fall. Additionally, as to Pelitire's claims for intentional infliction of emotional distress, defendants argued that the undisputed evidence showed that Pelitire would not be able to carry her burden of establishing all of the elements necessary in order to prove this claim. Lastly, as to Pelitire's claims for sexual assault and battery, defendants averred that even if she were able to show that a sexual relationship existed between herself and Rinker, the undisputed evidence established that she was a consenting participant barring recovery for her claims of sexual assault and/or battery. To support its motion, defendants attached the complete deposition transcripts of Pelitire, Rinker, and the corporate deposition of FELC, as well as several of the emails exchanged between the parties. Defendants also attached a copy of Pelitire's petition for damages, her answers to requests for admissions, photographs, and the affidavit of Rinker.[8]
In opposition to defendants' motion for summary judgment, conceding that Louisiana does not recognize a cause of action for "clergy malpractice," Pelitire stated that she had "abandoned" her clergy malpractice claim and argued that her petition adequately sets forth a claim against Rinker for "negligent secular counseling."[9] In addition to attaching all of the exhibits she previously attached in support of her motion for partial summary judgment, Pelitire attached some additional emails exchanged between the parties, photographs, her revised affidavit, and excerpts from the depositions of her treating psychiatrist, Dr. Chris Lartigue, and her boyfriend, Shing Wong. Further, Pelitire denied that she ever consented to any of Rinker's sexual advances and, thus, claimed that a genuine issue of material fact remained precluding summary judgment in favor of defendants regarding her consent. Pelitire argued that FELC was liable for Rinker's negligent secular counseling and for its failures to have a sexual prevention program in place, to conduct a background check prior to hiring Rinker, and to adequately train and supervise Rinker.
The cross-motions for summary judgment came for hearing on March 16, 2018, after which the trial court took the matter under advisement. On March 21, 2018, the trial judge issued judgment, with written reasons, granting summary judgment in favor of Rinker, FELC, and CMIC, and dismissing all of Pelitire's claims against them, with prejudice. Additionally, the trial court denied Pelitire's motions for partial summary judgment against Rinker and against FELC as moot.
It is from this judgment that Pelitire files the instant appeal.
ASSIGNMENTS OF ERROR
On appeal, Pelitire contends the trial court erred: (1) in granting defendants' summary judgment when there remain "multiple disputed issues of material fact;" (2) in ruling that clergy members are immune from general tort liability in light of Louisiana jurisprudence holding that "negligent counseling" is an available remedy for an offending pastor that holds himself out as a "trained secular counselor;" (3) in finding that Pelitire consented to Rinker's sexual advances; and (4) in determining *826 that FELC is not vicariously liable for Rinker's actions "by failing to supervise, train, and had no rules for sexual misconduct of employees."
LAW AND ANALYSIS
Summary Judgment
Appellate courts review the granting of summary judgment de novo using the same criteria governing the trial court's consideration of whether summary judgment is appropriate. Larson v. XYZ Insurance Company , 16-0745 (La. 5/3/17), 226 So.3d 412, 416 ; Gutierrez v. State Farm Fire & Cas. Ins. Co. , 13-341 (La. App. 5 Cir. 10/30/13), 128 So.3d 509, 511. A motion for summary judgment "shall be granted if the motion, memorandum, and supporting documents show that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law." La. C.C.P. art. 966(A)(3) ; Adams v. Grefer , 17-250 (La. App. 5 Cir. 12/13/17), 234 So.3d 201, 205. The summary judgment procedure is designed to secure the just, speedy, and inexpensive determination of every action. The procedure is favored and shall be construed to accomplish these ends. La. C.C.P. art. 966(A)(2).
In ruling on a motion for summary judgment, the judge's role is not to evaluate the weight of the evidence or to determine the truth of the matter, but instead, to determine whether there is a genuine issue of triable fact. All doubts should be resolved in the non-moving party's favor. Hines v. Garrett , 04-0806 (La. 6/25/04), 876 So.2d 764, 765. A fact is material if it potentially ensures or precludes recovery, affects a litigant's ultimate success, or determines the outcome of a legal dispute. A genuine issue is one as to which reasonable persons could disagree; if reasonable persons could reach only one conclusion, there is no need for a trial on that issue and summary judgment is appropriate. Id. at 765-66. Conclusory allegations and unsupported speculation will not support the finding of a genuine issue of material fact. Trench v. Winn-Dixie Montgomery LLC , 14-152 (La. App. 5 Cir. 9/24/14), 150 So.3d 472, 476.
Although it may appear unlikely from the record that one party can prevail, summary judgment cannot be granted once the court detects the existence of a material fact. Dearie v. Ford Motor Corp. , 583 So.2d 28, 29 (La. App. 5th Cir. 1991), writ denied , 588 So.2d 1117 (La. 1991). If the evidence presented is subject to conflicting interpretations, or reasonable minds might differ as to its significance, summary judgment is not proper; only when reasonable minds must inevitably concur is summary judgment warranted and any doubt should be resolved in favor of a trial on the merits. Id. at 30. The mere belief that the litigant is unlikely to prevail upon the merits is not sufficient to warrant summary judgment, thus depriving the litigant of a trial. Boye v. Daiquiris & Creams No. 3, Inc. , 11-118 (La. App. 5 Cir. 11/15/11), 80 So.3d 505, 507, writ denied , 11-2778 (La. 2/17/12), 82 So.3d 290. The weighing of conflicting evidence and making evaluations of credibility have no place in the summary judgment procedure. Dearie , 583 So.2d at 30.
On a motion for summary judgment, the burden of proof remains with the movant. La. C.C.P. art. 966(D)(1). However, if the moving party will not bear the burden of proof on the issue at trial and points out that there is an absence of factual support for one or more elements essential to the adverse party's claim, action, or defense, then the non-moving party must produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial. If *827 the opponent of the motion fails to do so, there is no genuine issue of material fact and summary judgment will be granted. Id. ; see also Schultz v. Guoth , 10-0343 (La. 1/19/11), 57 So.3d 1002, 1006 ; Adams v. Grefer , 234 So.3d at 206.
When a motion for summary judgment is made and supported as provided in La. C.C.P. art. 967, an adverse party may not rest upon the mere allegations or denials of his pleadings, but his response, by affidavits or as otherwise provided in La. C.C.P. art. 967, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be rendered against him. La. C.C.P. art. 967(B) ; see also Darr v. Marine Elecs. Solutions, Inc. , 11-908 (La. App. 5 Cir. 5/22/12), 96 So.3d 527, 533, writ denied , 12-1442 (La. 10/8/12), 98 So.3d 860.
Pelitire's General Negligence Claims Against Rinker
Negligent Counseling
Conceding that Louisiana does not recognize a claim for "clergy malpractice," Pelitire contends that her petition adequately states a claim against Rinker for "negligent secular counseling." As such, Pelitire avers the trial court erred in ruling that clergy members are immune from general tort liability in light of Louisiana jurisprudence holding that "negligent counseling" is an available remedy for an offending pastor that holds himself out as a trained secular counselor. We disagree and find that under the particular facts presented in this case, the trial court did not err.
Unlike licensed practical counselors and professional mental health counselors,[10] Louisiana law does not impose a requirement upon priests and/or members of the clergy who offer pastoral or spiritual counseling to be licensed, and they are not subjected to the same standards of care applicable to state-licensed counselors acting under the same or similar circumstances. See Lann v. Davis , 34,892 (La. App. 2 Cir. 8/22/01), 793 So.2d 463, 466. There is currently no professional standard of care in Louisiana that applies to pastoral or spiritual counselors that are not licensed counselors or licensed mental health professionals. Thus, while clergy who provide pastoral counseling through the aegis of the church-and not as licensed professional counselors -may owe a moral and/or ethical duty to their parishioners, Louisiana courts have declined to impose a legal duty upon the clergy to exercise ordinary care in providing pastoral counseling.
If, however, the clergyman or minister is also a licensed professional counselor, a licensed marriage and family therapist, a licensed clinical social worker, a clinical psychologist or a psychiatrist, and engages in counseling in his/her licensed professional capacity , the clergyman may be held to the same legal standards required of a state-licensed professional counselor under the same or similar circumstances. See Lann , 793 So.2d at 466-467 ; Roppolo v. Moore , 93-2361 (La. App. 4 Cir. 7/27/94), 644 So.2d 206, fn 4, writ denied , 04-3032 (La. 2/17/95), 650 So.2d 253 ; Sanders v. Casa View Baptist Church , 134 F.3d 331, 336 (5th Cir. 1998). To date, no Louisiana court has imposed liability upon a clergy member, who was also a state-licensed counselor, or held himself out to be a "duly qualified person *828 engaged in providing psychological counseling," for the negligent acts he/she committed while engaged in professional counseling with a parishioner.
In the case sub judice , because a cause of action for clergy malpractice or negligent pastoral counseling is untenable, the viability of Pelitire's claim for "negligent secular counseling" rests on her ability to prove that Rinker, who was indisputably not a state-licensed counselor, held himself out to her to be a "duly-qualified person engaged in providing psychological counseling" when he purportedly counseled her. This Pelitire failed to do.
From our de novo review of the voluminous record, including Pelitire's petition for damages-which was never amended-exhibits, depositions, and the affidavits of the parties, we find reasonable minds could reach only one conclusion: in "counseling" Pelitire, Rinker never held himself out to her as either a "trained secular counselor," a "professional counselor," a "duly-qualified person engaged in providing psychological counseling," or licensed in any capacity to provide psychological counseling. To the contrary, the evidence unequivocally shows that Pelitire had actual knowledge (having helped Rinker prepare his resume in or about 2004) that Rinker's education, training and experience in counseling was limited to "pastoral counseling," which he received while attending Concordia Seminary.
Moreover, Pelitire's responses to request for admissions contradict her claim for negligent secular counseling. In particular, Pelitire specifically denied that there was ever an occasion "that she invited [Rinker] to her home that did not involve his capacity as a minster for [FELC ]." [Emphasis supplied.] Pelitire's deposition testimony confirms that she believed Rinker was acting in his capacity as a Lutheran minister-a position she argued he exploited and used to exercise undue influence over her-when he counseled her and committed the alleged nonconsensual sexual acts upon her. For example, Pelitire testified as follows:
Q. What is it that makes you believe [Rinker] did these things to you in his capacity as a Lutheran minister as opposed to Craig Wayne Rinker? ...
A. Because when he came over, he brought over communion and wine, and then he took me into the bedroom and did those things and he prayed.
Additionally, we disagree with Pelitire that the allegations set forth in her petition pertaining to Rinker's purported negligence state a claim for "negligent secular counseling." For example, as to each "lascivious sexual act" and omission Pelitire avers Rinker committed against her, she alleged such acts occurred while he was working in the course and scope of his "duties in ministering and counseling" as "a Lutheran Minister and employee and agent for FELC." Pelitire alleged that "as a parishioner of FELC," when Rinker made visits to her home to administer communion to her, he committed various sexual acts upon her when she "sought the comfort, guidance, and religious counseling of a Lutheran Minister ..." Pelitire also alleged that Rinker's "abusive, deviant, sexual behavior occurred during religious counseling appointments" where Rinker "abused his position as a minister ... to gain sexual favors from" Pelitire. Lastly, Pelitire alleged that Rinker used his authority as a Lutheran minister to exploit her "fragile emotional" state and did so "in violation of Lutheran Minister and parishioner/patient Ethical Rules, and in violation of [Lutheran] guidelines that hold that sexual contact that occurs concurrent with the minister patient relationship constitutes sexual misconduct."
*829 Nowhere in Pelitire's petition does she aver that Rinker breached the standard of care owed by a licensed professional counselor. Instead, she alleged that Rinker's sexual advances towards her violated the Lutheran Church's guidelines, which prohibit ministers from engaging in sexual conduct while performing the duties of their ministry. As the Court in Roppolo stated:
This Court has no right to interpret religious doctrine, nor standards of religious behavior. What may be viewed as sexual misconduct by one religion may be permitted or encouraged by another. To do as plaintiff requests would require this Court to apply different standards to different litigants depending on their religious affiliations. This is a secular court. If sexual or other conduct of a priest violates secular standards, e.g., child molestation, this Court will impose whatever civil or criminal sanctions may be appropriate. But this Court has no authority to determine or enforce standards of religious conduct and duty. [Internal citations omitted.] [Emphasis in original.]
Roppolo , 644 So.2d at 208.
Thus, as to the allegations of Pelitire's petition pertaining to Rinker's negligent counseling, we find these allegations state a claim for clergy malpractice and not for "negligent secular counseling" as Pelitire contends. Further, we find that the undisputed evidence submitted on summary judgment shows that there is no genuine issue of material fact that Rinker did not hold himself out to Pelitire as a "duly qualified person engaged in psychological counseling" and, thus, we decline to impose upon him the same standard of care applicable to state-licensed counselors under the same or similar circumstances. In short, Pelitire offered no evidence that Rinker breached any legal duty owed to her unrelated to his role as a Lutheran minister or pastoral counselor. While Rinker's actions may have been unethical, they do not support a claim for negligence under Louisiana law. The trial court did not err in dismissing Pelitire's general negligence claims against Rinker. This assignment is without merit.
Negligent Infliction of Emotional Distress
Louisiana does not recognize an independent tort of negligent infliction of emotional distress; however, a plaintiff may recover for unintentional or negligent infliction of emotional distress unaccompanied by physical injury under La. C.C. art. 2315, which provides, in pertinent part, that "[e]very act whatever of man that causes damages to another obliges him by whose fault it happened to repair it." Covington v. Howard , 49,135 (La. App. 2 Cir. 8/13/14), 146 So.3d 933, 937, writ denied , 14-1927 (La. 11/21/14), 160 So.3d 973. See also Gonzales v. Ochsner Clinic Foundation , 14-873 (La. App. 5 Cir. 5/14/15), 170 So.3d 1099, 1106.
To recover for negligent infliction of emotional distress without an accompanying physical injury, a plaintiff must prove the underlying cause of action, i.e. , the negligence claim. Gonzales , 170 So.3d at 1106. There must be proof that the defendant violated some legal duty owed to the plaintiff, and the plaintiff must meet the heavy burden of proving outrageous conduct by the defendant. Simmons v. State , 18-0174 (La. App. 4 Cir. 8/29/18), 255 So.3d 701, 705, writ denied , 18-1613 (La. 12/17/18), 259 So.3d 345. Additionally, recovery is limited to facts constituting "special circumstances" involving the "especial likelihood of genuine and serious mental distress, arising from the special circumstances ...." Moresi v. State Through Dep't of Wildlife and Fisheries , 567 So.2d 1081, 1096 (La. 1990) ;
*830 Covington , 146 So.3d at 937. Louisiana courts have limited recovery to those cases involving factual circumstances where the defendant's conduct was declared outrageous because the defendant was found to have breached a "special direct duty to the plaintiff and where the resulting mental distress the plaintiff suffered was easily associated with the defendant's conduct." Covington , 146 So.3d at 938.
In Gonzales , supra , the plaintiffs filed suit alleging negligence surrounding a delayed diagnosis of Mr. Gonzales' Merkel cell carcinoma claiming that an earlier diagnosis and removal would have resulted in a less invasive surgery and a better prognosis. Gonzales , 170 So.3d at 1103. This Court affirmed the trial court's grant of summary judgment in favor of the defendant finding that the plaintiffs failed to present evidence upon which reasonable minds could differ as to whether Mr. Gonzales sustained any harm as a result of the delayed diagnosis. Id. at 1106. Absent proof of harm, the plaintiffs failed to show they would be able to carry their burden of proving the requisite elements to support a medical malpractice claim at trial. In failing to first prove the underlying malpractice claim, we found the plaintiffs also could not prove their entitlement to damages for negligent infliction of emotional distress. Id.
We reach the same result in the case sub judice . As discussed infra , Louisiana law does not recognize a cause of action for clergy malpractice and, for the reasons discussed above, the record does not support a claim against Rinker for negligent secular counseling. Consequently, under Louisiana law, which does not impose a minimum standard of care upon ministers who engage in pastoral counseling, Rinker did not owe a legal duty to Pelitire that would support a claim for negligent infliction of emotional distress. Moreover, regarding Pelitire's claims for sexual assault and battery (discussed infra ), these claims involve intentional torts, not negligence , and likewise do not support a claim for negligent infliction of emotional distress. Consequently, we find the trial judge did not err in dismissing Pelitire's claim against Rinker for negligent infliction of emotional distress.
Pelitire's Intentional Tort Claims Against Rinker
Pelitire's petition alleged that Rinker is liable to her for the intentional infliction of emotional distress and for the intentional torts of sexual assault and sexual battery. On appeal, Pelitire argues the trial court erred in finding that no genuine issue of material fact remains regarding these claims.
Intentional Infliction of Emotional Distress
In dismissing Pelitire's claim against Rinker for intentional infliction of emotional distress, the trial court determined that Pelitire failed to present sufficient evidence establishing that she would be able to prove all of the necessary elements to establish her claim. We agree.
A cause of action for intentional infliction of emotional distress is viable in Louisiana; one who by extreme and outrageous conduct intentionally causes severe emotional distress to another is subject to liability for such emotional distress. White v. Monsanto Co. , 585 So.2d 1205, 1209 (La. 1991). To recover, a plaintiff must establish: (1) that the conduct of the defendant was extreme and outrageous, (2) that the emotional distress suffered by the plaintiff was severe, and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct.
*831 Scamardo v. Dunaway , 96-1036 (La. App. 5 Cir. 4/29/97), 694 So.2d 1041, 1042, writ denied , 97-1395 (La. 9/5/97), 700 So.2d 517 ; White , 585 So.2d at 1209. The plaintiff's burden is a heavy one. Scamardo , 694 So.2d at 1042. Conduct which is merely tortious or illegal does not rise to the level of being extreme or outrageous. Nicholas v. Allstate Ins. Co. , 99-2522 (La. 8/31/00), 765 So.2d 1017, 1025. In White v. Monsanto Co. , the Supreme Court explained that the conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. White , 585 So.2d at 1209.
On appeal, Pelitire has identified four events involving Rinker which she contends rise to the level of "extreme and outrageous," which include: (1) exposing his vasectomy scars and penis to Pelitire while in her kitchen; (2) either licking her anus or performing oral sex upon her under the guise of inspecting an infected boil located near her anus; (3) providing Pelitire with a vibrator and sending her pornographic photos of nude women; and (4) suggesting to Pelitire that she "auction off her technical virginity." Pelitire contends that these four events were not exclusive, but represent Rinker's most "egregious" and "outrageous" acts.
Pelitire claims that when Rinker allegedly exposed his penis to her-an act Rinker denies-this caused her to be "shocked" and that she "did not know how to react." The record, however, belies this contention. Specifically, the record shows that Pelitire continued to email Rinker almost daily in the weeks and months following the incident. She continued to allow Rinker into her home and continued to spend copious amounts of time with him suggesting that Rinker's alleged exposure of his penis did not cause her extreme distress, if any distress at all.
Rinker admitted in his deposition that he requested to inspect a boil on Pelitire's buttocks located near her anus because Pelitire was concerned it had become infected. According to Pelitire, this incident occurred on April 2, 2014 in Rinker's FELC office when she stopped by on her way home from a doctor's appointment.[11] Though Pelitire conceded in her deposition that she voluntarily removed her shorts and permitted Rinker to observe the boil, she argued that he then proceeded to lick her anus. Pelitire testified that she told Rinker to stop, and that he did.[12] From the time this alleged "outrageous" and "egregious" incident occurred and the next time Pelitire and Rinker saw one another two weeks later, the record reflects that over forty emails were exchanged between the parties. However, nothing whatsoever about this incident, which purportedly caused Pelitire "extreme emotional distress," was even mentioned.
Regarding Pelitire's contention that Rinker's suggestion to her that she "auction off her technical virginity" was "outrageous" and caused her "extreme distress," our review of the record shows that it was an August 1, 2014 email from Peltire to Rinker that actually precipitated his suggestion:
You would not believe the crazy ideas that have been running through my head to make money. Kickstarter campaigns, Rite Aid Videos. Rite Aid Books.
*832 But I don't have the time to even do that and it will take months before I see any income from any of that. Maybe I should just auction off my semi-virginity....
[Signed] Stressing ... Moonbeam[13]
In response to Pelitire's apparent joke about her "semi-virginity," and apparently commiserating regarding her financial plight, Rinker responded that same day in kind by writing:
I sure do understand that you want the world to stop so that you can get off, right now. I am here with you. I can perceive that you are in serious trouble with income, let alone pulling out of your sock $ 1,600 right now. That would drive me to drink or gamble to get the money, neither of which ever works.
Hum, even auctioning off your technical virginity will take time. Make sure not to accept bids under $ 100K after taxes and that will be for one night only. Actually, of course, I know you won't go that route, because you will need to show some of the goods on your Internet ad, at least you in a skimpy bikini. It's not you at all!
Similarly, Rinker's sending Pelitire photographs of nude women was also initiated by Pelitire. In her deposition, Pelitire testified that after she had lost weight, Rinker made a comment to her about her body and she "jokingly" mentioned wanting to have some nude photographs taken of herself, "but when [she] said that, [she] meant artsy nude ... [n]ot pornographic nude." In response to her comment, Rinker emailed Pelitire three photographs of nude women, to which she replied:
I like the first one the best. Probably the youngest girl. I'm not sure I like the poses, though. I had something a little different in mind. I will try to find a photo of what I'm looking for. Can I send it to you? Or not? The last one (the tan girl) has tiny breasts, but HUGE nipples. My nipples were never that huge.... Love, Lori.
In her deposition, Pelitire explained her response and why she did not tell Rinker that she was actually "extremely distressed" and offended by the nude photographs he sent to her:
I was trying to be polite. I don't think he should have sent those as a pastor. When I saw them, I was shocked, but because he was a pastor, I was being polite.
Pretermitting consideration of whether reasonable minds might reach different conclusions as to whether these alleged "sexual" acts, if proven, rise to the level of "extreme and outrageous," and/or whether Pelitire can prove that she actually suffered severe emotional distress as a result of the accused conduct, based upon our de novo review of the record, we find that Pelitire has failed to present sufficient evidence establishing that she will be able to carry her burden of proving an essential element of her claim for intentional infliction of emotional distress: that Rinker intended to cause Pelitire severe emotional distress or that he knew with certainty that extreme emotional distress would result from his actions.
To the contrary, the record is replete with email evidence corroborating Rinker's deposition testimony that he cared very much about Pelitire and her well-being, and that he had no reason to believe or any indication that his presence or conduct was causing Pelitire any emotional distress, much less, extreme emotional distress. In fact, the record contains several emails from Pelitire to Rinker indicating the exact opposite. Specifically, on several occasions Pelitire emailed Rinker that his *833 presence reduced her stress and anxiety and that his time with her was helping her. Moreover, in her deposition, Pelitire testified that whenever she did ask Rinker to stop his sexual advances, he did. Consequently, we find the trial court did not err in dismissing Pelitire's claim for intentional infliction of emotional distress on the basis that there remained no genuine issue of material fact regarding whether Pelitire would be able to carry her burden of proving the requisite elements of this claim.
Sexual Assault and Sexual Battery
Pelitire argues the trial court erred in dismissing her intentional tort claims against Rinker for sexual assault and sexual battery based on its finding that Pelitire consented to Rinker's sexual advances. Based upon our de novo review of the record, we find Pelitire's contention on this issue has merit.
In the context of Louisiana delictual law, the intentional tort of "battery" is "[a] harmful or offensive contact with a person, resulting from an act intended to cause the plaintiff to suffer such a contact." Landry v. Bellanger , 02-1443 (La. 5/20/03), 851 So.2d 943, 949. An "assault" is, generally speaking, the threat of such harmful or offensive contact. Lawson v. Straus , 95-1537 (La. App. 4 Cir. 3/14/96), 673 So.2d 223, 226. The defendant's intention need not be malicious nor need it be an intention to inflict actual damage. It is sufficient if the defendant intends to inflict either a harmful or offensive contact without the other's consent. Landry , 851 So.2d at 949. Consent is an absolute defense in a sexual assault case; if no intentional tort was committed, then no tort was committed. Doe v. Breedlove , 04-0006 (La. App. 1 Cir. 2/11/05), 906 So.2d 565, 577. Similarly, the defense of consent is a bar to recovery for the intentional infliction of harmful or offensive touching. Cole v. Department of Public Safety and Corrections , 01-2123 (La. 9/4/02), 825 So.2d 1134, 1142.
In order to succeed on a battery claim, the plaintiff must prove "all prima facie elements of the tort, including lack of consent to the invasive conduct." Landry , 851 So.2d at 954. Negligence has long been defined in terms of the reasonableness of a person's conduct or belief, based upon an objective standard. Breedlove , 906 So.2d at 573. Thus, "if a person had the reasonable belief that another consented to sexual activity, the former cannot be said to be 'negligent' in failing to secure absolute proof of such consent before engaging in the activity, since he was by definition acting reasonably, even if under a mistaken belief. But if the actor did not reasonably believe consent was given, or should reasonably have known that supposed consent was withdrawn, pursuing such activity clearly goes beyond negligence, by virtue of its inherent character; sexual contact can rightfully be characterized as the ultimate violation of personal physical integrity, short of death." Id.
In the instant case, it is apparent to us on de novo review that the trial court improperly weighed the evidence and credibility of the witnesses in order to reach its conclusion that no sexual assault or battery occurred because Pelitire and Rinker were having a consensual adulterous affair. In doing so, the trial court erred.
On the one hand, the record reflects that Rinker denied that any inappropriate sexual touching or advances ever took place. And, to the extent such conduct did occur, Rinker averred that Pelitire consented and was a willing participant. On the other hand, Pelitire adamantly argued that she did not consent to Rinker's sexual advances. Alternatively, Pelitire claimed that given Rinker's position of authority as an ordained minister, she was unable to give *834 consent due to her vulnerable emotional state and Rinker's exercise of undue influence over her.
Faced with the competing deposition testimony and affidavits of Pelitire and Rinker, we find the trial court improperly weighed the evidence and made credibility determinations when concluding that the parties were engaged in a consensual adulterous affair. The law is well-settled that the trial court cannot make credibility determinations, evaluate testimony, or weigh conflicting evidence in making its decision to grant or deny a motion for summary judgment. Smith v. Our Lady of the Lake Hosp., Inc. , 93-2512 (La. 7/5/94), 639 So.2d 730, 751. Also, on summary judgment, all doubts should be resolved in the non-moving party's favor. Larson , 226 So.3d at 416. The resolution of conflicting evidence and the assessment of credibility lies with the factfinder at a trial and is not to be determined on summary judgment.
We find the competing and conflicting evidence contained in the record sufficiently raises issues of material fact regarding whether the sexual conduct occurred and, if so, whether Pelitire was able to give her consent and/or was a willing participant. We are unable to state conclusively that "reasonable minds could not differ in their interpretation of the evidence" regarding Pelitire's consent. See Dearie , 583 So.2d at 30. Accordingly, finding the trial court erred, we reverse the trial's grant of summary judgment dismissing Pelitire's intentional tort claims against Rinker for sexual assault and sexual battery, and remand the matter for further proceedings solely as to these causes of action.
Pelitire's Claims Against FELC
On appeal, Pelitire argues the trial court erred in ruling that FELC was not vicariously liable for Rinker's negligent counseling by failing to supervise, train, and having had no rules of sexual misconduct of employees in place. We disagree.
In Louisiana, vicarious liability and negligent hiring, training and supervision present separate and independent theories of liability. Vicarious liability is based upon La. C.C. art. 2320, which provides that an employer is liable for the negligent acts of its employees that occur "in the exercise of the functions in which they are employed." Thus, vicarious liability is imposed upon an employer without regard to its own negligence or fault; it is a consequence of the employment relationship. Buford v. Williams , 11-568 (La. App. 5 Cir. 2/14/12), 88 So.3d 540, 547, writ denied , 12-0624 (La. 4/27/12), 86 So.3d 630.
An employer's liability for the negligent hiring, training and supervision of its employees, however, is based upon the independent or direct negligence of the employer and its duty to exercise reasonable care in hiring, training and supervising its employees pursuant to La. C.C. art. 2315. See Roberts v. Benoit , 605 So.2d 1032, 1037 (La. 1991). The major difference between the two theories of liability is that the tort of negligent hiring is not limited to the narrow confines imposed by the respondeat superior's "scope of employment" limitation. A similar limitation, however, is imposed on the negligent hiring cause of action. This limitation is that the employee must in some respect have been engaged in furthering the employer's business when the employee crossed the line. Id. Thus, the considerations relied upon by courts in imposing liability under the two theories are similar. Id.
Initially, we note that Pelitire's ability to recover against FELC under either theory of liability-vicarious liability or its direct negligence-hinges on Pelitire's ability to prevail at trial on her claims against Rinker for sexual assault and sexual battery. Roppolo , 644 So.2d at 209. Nonetheless, *835 we find that even if Pelitire subsequently prevails on her sexual assault and sexual battery claims, she has failed to present evidence of a material fact sufficient to warrant a trial on either the issue of FELC's vicarious liability or its direct liability. Specifically, we find that reasonable minds reviewing the evidence could arrive at only one conclusion: none of the sexual acts allegedly committed by Rinker occurred in his capacity as a Lutheran minister for FELC .
FELC'S Vicarious Liability for Rinker's Negligent Acts
In the absence of any wrongful or actionable conduct by Rinker, there can be no imposition of vicarious liability on FELC pursuant to the doctrine of respondeat superior . Thus, as to Pelitire's contention that FELC is vicariously liable for Rinker's alleged negligent secular counseling, having already determined that Rinker's actions do not support a cause of action for negligence under Louisiana law, it follows that FELC cannot be held vicariously liable without Rinker's negligent liability. See Roppolo , 644 So.2d at 209. Consequently, FELC bears no liability to Pelitire for Rinker's alleged negligent counseling.
FELC'S Vicarious Liability for Rinker's Intentional Torts
We also find that FELC does not bear liability to Pelitire for Rinker's alleged commission of the intentional torts of sexual assault and sexual battery. To determine whether an employer is vicariously liable for the intentional tortious acts of an employee, the following factors are considered: (1) whether the tortious act was primarily employment rooted; (2) whether the violence was reasonably incidental to the performance of the employee's duties; (3) whether the act occurred on the employer's premises; and (4) whether it occurred during the hours of employment. LeBrane v. Lewis , 292 So.2d 216, 218 (La. 1974).
In the instant case, the record contains undisputed testimony that the Lutheran church prohibits any of its members-especially one of its ordained ministers-from engaging in sex outside of marriage. Moreover, when a married minister such as Rinker engages in sexual activity with a parishioner, it is clearly not a part of the minister's duties performed for FELC nor customary within the business of the Lutheran church. Such conduct is contrary to the principles of the Lutheran church and is, indisputably, not incidental to the tasks assigned to Rinker as a "supply" pastor by FELC. Based upon the undisputed facts of this case, we find that as a matter of law, there is no basis for imputing vicarious liability to FELC for the alleged intentional torts, if any, committed by Rinker against Pelitire.
FELC's Liability for Negligent Hiring, Training, and Supervising Rinker
We reach the same result regarding Pelitire's claims against FELC for its alleged negligent hiring, training and supervision of Rinker. On appeal, Pelitire alleges the following acts to support her claim for FELC's direct liability: (1) FELC did not perform a background check prior to hiring Rinker; (2) FELC failed to provide sexual harassment training to Rinker; (3) FELC failed to supervise Rinker during his home visits; and (4) FELC did not investigate Pelitire's complaints of sexual abuse by Rinker.
First, because Pelitire has "abandoned" her clergy malpractice claim and contends that Rinker's negligence was allegedly rooted in his providing "secular" counseling to her, we fail to see how FELC could be liable for the "negligent *836 hiring, training, or supervision" of Rinker because it indisputably did not employ Rinker in a secular capacity to perform "secular counseling." The record shows that FELC is a Lutheran church governed by the constitution and bylaws of the Lutheran Missouri Synod and its religious principles. There is no evidence in the record that FELC was ever in the business of providing secular counseling. The uncontroverted evidence shows that FELC hired Rinker as one of four "supply" pastors to perform home visits, make communion calls, provide pastoral counseling, lead Bible studies and give homilies-duties solely related to the ministry of FELC.
Next, the testimony of the parties establishes that Pelitire met Rinker prior to his employment with FELC. When Pelitire contacted him in 2013 seeking "prayer and spiritual guidance," she did so wholly unrelated to any affiliation or employment Rinker had with FELC. Though Pelitire may have contacted Rinker, her old acquaintance, seeking spiritual guidance because he happened to be someone whom she knew to be a minister, Pelitire presented no evidence that she contacted Rinker for reasons in any way related to his employment with FELC.
The following facts are undisputed:
• Pelitire never contacted FELC seeking pastoral counseling, a home visit or communion;
• FELC never directed Rinker to provide counseling, home visits or communion to Pelitire;
• Pelitire never attended a single church service or activity held at FELC;
• While Pelitire was encouraged to join FELC and received a card welcoming her, she never became a member of FELC;
• Pelitire never contacted FELC to advise of Rinker's alleged sexual advances towards her; and
• Pelitire never contacted FELC to advise that Rinker was making unwanted visits to her home.
And, though there is evidence that Rinker initially charged FELC for several home visits and communion calls on behalf of Pelitire, the admissible evidence shows that to the extent these charges were incurred for "religious services" performed on FELC's behalf, they were incurred prior to April 2, 2014, the date Pelitire's petition avers Rinker began his sexual advances towards her and increased his weekly visits to her home. Moreover, Pelitire failed to present admissible evidence to refute the sworn testimony of FELC's corporate representatives that FELC was unaware that Rinker was billing the church for visiting Pelitire or giving her communion, or that Rinker was only authorized to bill the church for home visits, communion calls, and pastoral counseling of FELC's members , which Pelitire was not. Pelitire also presented no admissible evidence establishing that FELC was aware that Rinker was providing her with pastoral counseling or visiting her home numerous times a week.
Furthermore, Pelitire presented no evidence showing that FELC was required to conduct a background investigation of Rinker prior to hiring him, or that had such an investigation ensued, it would have revealed a criminal background or the unsuitability of Rinker for holding a part-time pastoral position with the church. Pelitire also presented no evidence of any prior complaints made by parishioners or other members of the public regarding alleged sexual misconduct by Rinker, and FELC's representatives testified they were unaware of any such complaints. The uncontroverted evidence shows that Rinker *837 received his training from the Missouri Synod, who ultimately ordained him, and that Rinker received supervision from the Missouri Synod's regional director. The evidence also shows that Rinker did actually receive sexual abuse and sexual harassment training prior to his employment with FELC.
FELC's representatives testified that Pelitire never contacted anyone at FELC to report any alleged misconduct by Rinker, and that their first notice of Pelitire's allegations of Rinker's sexual misconduct occurred after Rinker voluntarily resigned his position with the church and was no longer within its authority. Pelitire presented no evidence regarding whether the Missouri Synod has instituted an investigation of her claims.
A claim against an employer for the torts of an employee based on the employer's alleged direct negligence in hiring, training, or supervising the employee is generally governed by the same duty-risk analysis used for all negligence cases in Louisiana. That is, in order to recover against an employer for its own negligence, the plaintiff bears the burden of proving each of five separate elements: duty, breach of duty, cause-in-fact, scope of liability or scope of protection, and damages. See Kelley v. Dyson , 08-1202 (La. App. 5 Cir. 3/24/09), 10 So.3d 283, 287.
Under the specific facts of the instant case and the uncontroverted evidence contained in the record, we find there is no evidence establishing a connection between FELC and Pelitire that would give rise to any duty owed by FELC to Pelitire regarding its hiring, training and/or supervision of Rinker. Absent the existence of a legal duty, Pelitire's claim for FELC's direct negligence falls. This assignment of error is without merit.
MOTION TO STRIKE
FELC and its insurer, CMIC, filed a motion to strike Pelitire's non-conforming brief claiming it exceeds the allowable page limit pursuant to Uniform Rules-Courts of Appeal 2-12.2(D)(1), and that it is not typed in the required font pursuant to Rule 2-12.2(D)(2). Finding no merit to the motion, the motion is denied.
CONCLUSION
For the foregoing reasons, we affirm, in part, the trial court's grant of summary judgment in favor of Rinker dismissing Pelitire's claims against him, with prejudice, for negligent counseling, negligent infliction of emotional distress, and intentional infliction of emotional distress; and we reverse, in part, the trial court's grant of summary judgment in favor of Rinker on Pelitire's claims for sexual assault and sexual battery, and remand the matter for further proceedings solely as to these causes of action.
Further, we affirm the trial court's grant of summary judgment in favor of FELC and CMIC dismissing Pelitire's vicarious liability and negligence claims against them, with prejudice. Lastly, we deny the motion to strike filed by FELC and CMIC.
AFFIRMED IN PART, REVERSED IN PART, REMANDED; MOTION TO STRIKE DENIED.

Pelitire obtained a bachelor's degree in marketing from the University of New Orleans, a private investigator's certificate from Delgado, and has owned and operated several on-line businesses. She also has appeared as an "extra" in several movies and worked as a courier. Pelitire has not been gainfully employed since 2010 due to mental and physical health issues, including numerous surgeries, chronic anxiety, agoraphobia, and panic attacks.

Pelitier was then the vice president and co-owner of Y Solutions.

Rinker was working for FELC as a "supply" pastor approximately 20 hours per week. He was paid on a "per service" basis for each of the various activities he performed on FELC's behalf, which included holding Bible study classes, preaching sermons, making communion calls, hospital visits, visiting homebound parishioners, and pastoral counseling.

Though Rinker encouraged Pelitire to become a member of FELC, and FELC welcomed her to join the church, Pelitire never once attended a FELC church service and never participated in a single FELC activity.

Although Pelitire-who had no previous affiliation with FELC-never contacted FELC requesting a pastoral visit or to be administered communion, between July 2013 and February 2014, at least two of Rinker's numerous visits to Pelitire's home were made by Rinker in his capacity as a minister working on behalf of FELC. Unbeknownst to FELC, Rinker charged FELC for the two "official" visits and the several communion calls he made to Pelitire's home in the months following Pelitire's July 2013 surgery. It is undisputed that Rinker did not charge or receive remuneration from FELC related to any of his visits and/or activities involving Pelitire following February 2014.

Specifically, Pelitire alleged that FELC employed Rinker and "sent him out to the homes of vulnerable individuals seeking help and paid [Rinker] to provide counseling services on behalf of and under the guise of the Church. By taking no action to ensure the safety of its members and the public from it's [sic] pastors' conduct, the Church is and should be liable for the harm Rinker caused [Pelitire]."

Mr. Shoener prepared a report in this case based on his experience in "assist[ing] churches and other organizations with the problem of sexual misconduct and boundary violations by clergy, staff, volunteers, and others."

Rinker, FELC, and CMIC also attached these exhibits in their opposition to Pelitire's motion for partial summary judgment.

According to Ms. Pelitire, her "core argument" is that Mr. Rinker, who "held himself out to be a trained counselor and secular life coach," "should be held to and violated secular standards as a counselor."

See La. R.S. 37:1103 et seq. (requirements for licensure as a licensed practical counselor and licensed marriage and family therapist), La. R.S. 37:2703 et seq. (requirements for licensure as a licensed clinical social worker) and La. R.S. 37:2352 et seq. (requirements for licensure as a licensed clinical psychologist).

This was the only occasion that Pelitire was ever on the property of FELC.

There is some indication that on a separate occasion (prior to the April 2, 2014 incident), while lying on a towel on the floor in Pelitire's bedroom, Rinker inspected her boil and performed oral sex on her.

"Moonbeam" was a nickname Rinker purportedly gave to Pelitire.